## 34272. HOLTON v. THE STATE.

HILL, Justice.

This is a death case.

Kermit Elmer Holton was indicted in DeKalb County in May, 1977, for armed robbery, burglary, and the murders of Clayton D. Pickrel and Helen S. Pickrel. The jury was instructed to find him not guilty of armed robbery. The jury found him guilty of burglary and the two counts of murder and imposed death penalties for both of the murders. As to the burglary, the trial court entered a judgment of not guilty notwithstanding the verdict on the ground that the state had not proved an entry without authority. The case is before this court on direct appeal and for review of the death penalties.

The evidence showed that the DeKalb County police answered a call from a neighbor of the Pickrels on March 4, 1976. The neighbor had been able to see Mr. Pickrel's body through a curtained den door after dark because a light was on in the den. The police forced their way into the home, where they found Mr. Pickrel lying face down next to a chair in the den with a small carpet sample covering his head. There was evidence from which the jury was authorized to find that Mr. Pickrel died of a gunshot wound fired from a hand-held .22 caliber weapon from a distance of 10 to 22 inches. Additionally, his left ear had been lacerated and he had sustained a severe abrasion to his left shoulder. These wounds apparently

were caused by blows from a tomahawk, which was found with a broken handle in the den. The tomahawk could have been broken by the blow to Mr. Pickrel's shoulder since considerable force had been applied. Additionally, a spear had been thrust through the sofa in the den. The spear too was broken.

Mrs. Pickrel's body was found lying face down in the hall. She had died of gunshot wounds to her head and chest, inflicted by a .22 caliber weapon. Her head was also covered with a piece of carpet. Mrs. Pickrel had been stabbed twice in the back, apparently after she had died, with a kitchen steak knife which was found broken into two pieces at her shoulder. Her ear had been almost severed, probably by either the tomahawk or the knife. A doctor from the State Medical Examiners Office testified that in his opinion the wounds suffered by the Pickrels had probably been inflicted by a right-handed person.

Because the thermostat in the house was set at 89 degrees, the elevated temperature had caused rapid deterioration of the bodies, making it difficult to determine the times of death. It was estimated, however, that they died about 20 hours earlier, sometime during the evening of March 3. The Pickrels had last been seen alive on the evening of March 2, when they entertained friends for dinner. Mrs. Pickrel had told their guests that evening that a former employee was in town and had nearly joined them for dinner.

The Pickrels' home had been ransacked and searched. Several items, including a camera, a television set, 2 diamond rings, a sander, and several items of silver, were missing. No unidentified fingerprints were found. Cigarette stubs of the same brand as that smoked by the defendant were found.

In May, 1977, Melinda Harris contacted the Lake County Sheriff's Office in Tavares, Florida, with information about the murders. DeKalb County police officers traveled to Florida where they interviewed Melinda Harris and taped her statement. She later testified at trial that on March 4, 1976, the defendant came to Florida to see her, bringing in his car a Sony television, a silver service, a sander and a mink stole with

the initials "HSP." All of those items were identified by the Pickrels' children as having belonged to their parents. Melinda Harris further testified that the defendant told her that he had killed an elderly man and woman — the man by hitting him in the head with a tomahawk and spearing him in the chest, the woman by shooting her in the head. He also told her that he had turned the thermostat "all the way up." Certain of this information had not been released to the press, e.g., the use of the tomahawk and the identity of the stolen items. In her statement Melinda Harris had said that many of the stolen items had been pawned in Las Vegas but that the defendant's sister had the silver service.

Following the interview with Melinda Harris, an investigator with the homicide section of the DeKalb County Police Department arrested the defendant in Savannah on May 21, 1977. Pursuant to a search warrant, he entered defendant's motel room where he found a number of bullets of the same caliber and manufacture as bullets found at the Pickrel murder scene and a checkbook of defendant's in which were written the Pickrels' name and telephone number. As Ms. Harris had said, the defendant's sister had the silver service.

The defendant testified at the trial; he admitted that he had formerly worked for the Pickrels, denied killing them, denied leaving the stolen articles with Melinda Harris, claimed Melinda told him she bought the stolen items at a flea market, and claimed he had been in Florida at a family barbeque at the time of the murders. He also stated that he was left-handed. Members of his family corroborated parts of his testimony.

The verdicts of guilty were substantiated by the evidence. Although not required to be, Ms. Harris' testimony was sufficiently corroborated. *Moore v. State,* 240 Ga. 210 (1) (240 SE2d 68) (1977).

1. Defendant's first enumeration of error is that the trial court erred in finding that Melinda Harris was not his common law wife, and in overruling his motion in limine by which he sought to prevent her from testifying. Melinda Harris filed a pre-trial motion claiming to be the defendant's wife and declaring her intention not to testify at the trial. The defendant then moved to exclude her

testimony, asserting his privilege as to confidential communications. After an evidentiary hearing, the trial court denied the motions. Whether Melinda Harris was the defendant's wife and thus entitled to claim the marital privilege of Code Ann. § 38-1604 was a fact question to be determined by the court. Where, as in this case, the extrinsic evidence contradicted the testimony of the two principal witnesses, the trial court was authorized to find that no common law marriage existed. *Overcash v. State,* 239 Ga. 499 (3) (238 SE2d 50) (1977); *Johnson v. State,* 232 Ga. 61 (5) (205 SE2d 190) (1974). For example, each of them from time to time had signed papers and made statements showing each to be single and much of their time together had been spent in states which do not recognize common law marriage.

2. Defendant's second enumeration of error is that the trial court erred in not granting his motion to compel disclosure and notice to produce with regard to the pre-trial statements of Melinda Harris. Pursuant to defendant's motions, the trial court conducted an in camera inspection of the state's file and ordered that certain material be provided to defendant. He declined, however, to order production of Melinda Harris' statement. We have reviewed the statement, which is in the record. (The statement became available to the defendant when Melinda Harris was examined by use of its contents.) Defendant argues that the statement was material and exculpatory because it provided a basis to challenge the credibility of the state's main witness, Melinda Harris. In her statement she related that she had informed a Las Vegas investigator, whose name she did not recall, of the murders. Defendant argues that this revelation is inherently suspicious because it presumes that a police officer failed to follow up on this tip. He further asserts that he could have successfully attacked Melinda Harris' credibility by locating the investigator and establishing the falsity of the report. We find this somewhat attenuated argument is not sufficient to establish that the statement at issue was material or exculpatory under the Brady doctrine. Brady v. Maryland, 373 U. S. 83, 87 (83 SC 1194, 10 LE2d 215) (1963). Furthermore, production was not required by *Rini*

*v. State,* 235 Ga. 60 (1) (218 SE2d 811) (1975). Although Melinda Harris was a key witness for the state and her credibility was an important factor, her testimony was corroborated by a wealth of physical evidence and the alleged misrepresentation in her statement does not tend to show that the defendant was not guilty or should be given lesser punishment. Nor was defendant entitled to the statement under *Brown v. State,* 238 Ga. 98 (231 SE2d 65) (1976). This court has held that "[S]tatements of witnesses in the prosecutor's files (nothing more appearing) may not be reached by Code Ann. § 38-801 (g)." *Stevens v. State,* 242 Ga. 34 (1) (247 SE2d 838) (1978).

3. Defendant's third and fourth enumerations of error concern his second motion to suppress. Defendant's initial motion to suppress was filed on October 5, 1977, and related to items seized from his sister's home, namely the stolen silver service. That first motion to suppress was considered and overruled during the three days set aside to entertain over a dozen pre-trial motions, October 17-19, 1977. Subsequently, on Thursday afternoon, November 3, 1977, defendant filed a second motion to suppress items seized from his motel room on or about May 20, 1977. The trial began, as scheduled, on Monday, November 7, 1977. On November 8th following argument by counsel on the merits of this motion, the trial court denied the motion, finding that it was "not timely filed and dilatory in nature." The motion sought suppression of the evidence obtained on May 20, 1977, from defendant's motel room and from his person on the ground, among others, that the affidavit supporting the search warrant was defective. Although the prosecuting attorney stated that the defendant was necessarily aware of the warrant because a copy was left with him on that date, defendant's attorney stated that that was not the case as his client was already under arrest. This was later corroborated by the police officer who conducted the search of the motel room when he testified at trial that the defendant was not present at the time because he was already under arrest.

The record shows, however, that at the time of the hearings on the pre-trial motions, October 17-19, 1977, defendant and his attorney were on notice that the defendant's motel room had been searched and certain of

his property seized. At the October 17 hearing, the prosecuting attorney pointed out that the defendant's attorney had viewed all of the state's evidence that was being held in the DeKalb County Police Department's property room but had not viewed the evidence at the State Crime Lab, which included "bullets, a checkbook, with some names written in the check book, some blood samples, and possibly some towels from the scene." Thus the defendant was on notice at least no later than October 17, 1977, both that his motel room had been searched and evidence seized, and that the evidence which he now complains of (the checkbook and bullets) was in the state's possession. The only thing defendant's counsel allegedly was not aware of was the fact that the room was searched pursuant to a warrant. No motion to suppress as to the motel search based upon a warrantless search, or defective warrant search, was made prior to November 3, 1977. In sum, we cannot find that the trial judge abused his discretion in ruling the second motion to suppress, brought nearly on the eve of trial, dilatory. *Thomas v. State,* 118 Ga. App. 359 (2) (163 SE2d 850) (1968), cert. den., 394 U. S. 943 (1969).

4. Defendant's remaining enumerations of error are addressed to the imposition of the death penalty.

According to law (Code Ann. § 27-2534.1(c)), the jury was instructed that if its verdict be death, it must designate in writing (signed by the foreman) the aggravating circumstance or circumstances which it found beyond a reasonable doubt. The jury was instructed that it should consider as aggravating circumstance whether the murders were outrageously or wantonly vile, horrible or inhumane in that they involved depravity of mind or aggravated battery to the victims.[1]

---

[1] The assistant district attorney conceded that the word "torture" should be omitted as there was no evidence of torture before the deaths occurred. The court also instructed the jury as to the definition of aggravated battery (Code § 26-1305) but instructed them that they could not find an aggravated battery to Mrs. Pickrel. (The state did not rely on one of the murders to obtain the death penalty as to the other murder (Code § 27-2534.1(b) (2).)

The jury fixed the punishment on both counts of murder as death "by reason of depravity of mind." This is only a part of a statutory aggravating circumstance. It omits all reference to the words "outrageously or wantonly vile, horrible or inhuman." See Code Ann. § 27-2534.1(b)(7). See also *Ruffin v. State,* 243 Ga. 95 (1979); *Godfrey v. State,* 243 Ga. 302 (1979).

It is unlikely that a statutory aggravating circumstance which consisted solely that the murder involved depravity of mind would survive a constitutional challenge based on Furman v. Georgia, 408 U. S. 238 (92 SC 2726, 33 LE2d 346) (1972); i.e., such an aggravating circumstance could be so broad as to allow the death penalty to be imposed at random in any murder case. See Gregg v. Georgia, 428 U. S. 153 (96 SC 2909, 49 LE2d 859) (1976). Here, however, although the jury was polled, the defendant did not object to the form of the verdict at the time of its return. Because there is to be a resentencing trial (see below), this problem should not arise again.

5. In the order denying defendant's motion for new trial, citing *Spivey v. State,* 241 Ga. 477 (2) (246 SE2d 288) (1978), the trial court recognized "that the pre-sentence charge does not comply with the decisions of the Supreme Court. . ." Because of the lengthy pre-trial and trial proceedings, however, the trial court declined to order a new trial on sentencing, pending a review by this court of the guilt-innocence proceedings. Likewise, the district attorney concedes in his brief that the charge does not satisfy *Spivey v. State,* supra, or *Lamb v. State,* 241 Ga. 10, 14 (243 SE2d 59) (1978). We agree. The court erred in failing to adequately charge on mitigating circumstances and in failing to make clear to the jury that they could recommend a life sentence even though they found a statutory aggravating circumstance. *Spivey v. State,* supra; *Lamb v. State,* supra; *Bowen v. State,* 241 Ga. 492 (3) (246 SE2d 322) (1978); *Burger v. State,* 242 Ga. 28 (10) (247 SE2d 834) (1978); *Stevens v. State,* 242 Ga. 34 (7) (247 SE2d 838) (1978); *Harris v. Hopper,* 243 Ga. 244 (1979).

The convictions of the defendant for murder are affirmed. The sentences of death for murder are set aside, and a new trial is allowed on the issue of punishment for

those offenses.

*Judgment affirmed in part and reversed in part. All the Justices concur, except Hall, J., who concurs in Divisions 1, 2, 3, 5 and the judgment.*

ARGUED JANUARY 8, 1979 — DECIDED MARCH 6, 1979 — REHEARING DENIED MARCH 27, 1979.

*Lawrence L. Schneider, Stroud P. Stacy,* for appellant.

*Randall Peek, District Attorney, Calvin A. Leipold, Jr., Assistant District Attorney, Arthur K. Bolton, Attorney General, William B. Hill, Jr., Staff Assistant Attorney General,* for appellee.