**UNITED STATES, Appellee,**

v.

**Ronnie A. CURTIS, Lance Corporal,
U.S. Marine Corps, Appellant.**

No. 63,044.
NMCM 87–3856.

U.S. Court of Military Appeals.

Argued July 8, 1991.

Decided Sept. 10, 1991.

For Appellant: *Lieutenant Commander John B. Holt*, JAGC, USN (argued); *Robert E. Morin, Esq., Captain Arthur R. Philpott*, JAGC, USN, *Lieutenant Commander Susan K. Milliken*, JAGC, USN, *Lieutenant Commander Louis Saccoccio*, JAGC, USNR–R, *Captain Dwight H. Sullivan*, USMC, *Lieutenant Frederic D. Firestone*, JAGC, USNR, *Lieutenant Thomas E. Miro*, JAGC, USNR (on briefs).

For Appellee: *Lieutenant Colonel J. S. Uberman,* USMC (argued); *Commander Thomas W. Osborne,* JAGC, USN, *Lieutenant Commander Lawrence W. Muschamp,* JAGC, USN, *Major Thomas D. Miller,* USMC (on briefs); *Lieutenant Commander J. Richard Chema,* JAGC, USN.

Amicus Curiae on behalf of Appellant: *Steven W. Hawkins, Esq.* (argued); *Julius L. Chambers, Esq.* and *Richard H. Burr, Esq.* (on brief)—for NAACP Legal Defense and Educational Fund, Inc.

### Opinion of the Court

EVERETT, Senior Judge:

Lance Corporal Curtis was tried 4 years ago by a general court-martial convened at Camp Lejeune, North Carolina. His conviction for two murders, burglary, and various other offenses led to an approved death sentence. The findings and sentence were affirmed by the Court of Military Review, 28 MJ 1074 (1989) (en banc), after which the case reached this Court for mandatory review. *See* Art. 67(a)(1), Uniform Code of Military Justice, 10 USC § 867(a)(1) (1989).

Initially we considered and heard extensive oral argument on two issues concerning the constitutionality of the capital punishment procedure under which Curtis was sentenced to death.[1] Ultimately we decided the two issues adversely to appellant and upheld the constitutionality of RCM 1004, Manual for Courts-Martial, United States, 1984, which prescribes the sentencing procedure in capital cases. 32 MJ 252 (1991).

Having decided issues that would be present in any capital case tried by court-martial, we next considered and heard argument on issues unique to appellant's case.[2]

I

## THE GOVERNMENT'S PEREMPTORY CHALLENGE OF STAFF SERGEANT EDWARDS

Lance Corporal Curtis is black. His two murder victims—his supervisor, First Lieutenant James Lotz, and Lotz' wife, Joan—were white. Appellant claims that trial counsel's peremptory challenge of Staff Sergeant Edwards, who is also black, was racially motivated and, therefore, violated *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

In *Batson,* the Supreme Court held that, under the Equal Protection Clause of the Fourteenth Amendment, a defendant at a state court trial has the right to be tried by a jury from which no "cognizable racial group" has been excluded. 476 U.S. at 96, 106 S.Ct. at 1723. Therefore, a prosecutor may not "challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Id.* at 89, 106 S.Ct. at 1719. Since equal protection is a component of Fifth Amendment due process, *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed 884 (1954), the requirements imposed by *Batson* are applicable to federal trials. In *United States v. Santiago–Davila,* 26 MJ 380 (CMA 1988), we specifically held that *Batson* applied to the exercise of government peremptory challenges in trials by courts-martial. Thus, if the prosecutor in appellant's case did challenge Staff Sergeant Edwards for reasons of race, appellant is entitled to a retrial.

In considering appellant's claim, we note at the outset that the general court-martial selected by the convening authority consisted of nine officers and six enlisted mem-

---

**1.** During some 4 hours of oral argument, we heard not only from counsel for the parties, but also from nine amici curiae. 32 MJ 252, 254 (1991).

**2.** This time the argument was briefer—only some 2 hours—and we heard from one amicus. Both oral arguments were televised live on C-

SPAN as part of the Court's Project Outreach. This project is intended to make the public more aware of the military justice system and of some of the issues with which it deals—such as the circumstances under which a death penalty may be imposed on a servicemember.

bers.[3] Three of the nine officers appointed to the court (33 percent) were black. Three of the six enlisted men appointed (50 percent) were also black. Both officers and enlisted persons in these percentages were significantly higher than the corresponding percentages of black officers and enlisted persons at that time in the Marine Corps or in the 2d Marine Division—to which appellant was assigned.[4] Thus, as the court-martial had been originally selected by the convening authority, there was no under-representation of either officers or enlisted persons from appellant's racial group; and, indeed, the statistics would suggest that the convening authority had acted affirmatively to assure that the court-martial would have substantial black membership. If trial counsel was attempting to use his peremptory challenge to exclude black members from the court, he not only was violating the precepts of *Batson*, but also was acting contrary to the apparent policy of the general who had appointed the court-martial—and had appointed trial counsel himself.

After the court members had been assembled and had received some general instructions from the military judge, the members were individually—and in order of rank—subjected to voir dire and possible challenge for cause. Colonel Campbell, who was white and was the senior member of the court-martial as appointed, stated that he had seen a report which contained a purported confession by the accused and did "not believe that I could be totally impartial in this hearing." He was challenged for cause by the Government without objection by the defense and excused. Colonel Van Ryzin, who was white, was questioned next and was challenged for cause by the defense because he was the rating officer for another member.[5] The military judge temporarily deferred his ruling on the challenge.

Lieutenant Colonel Ford, a white, was questioned and was not challenged for cause by either side. Lieutenant Colonel Smith, who was black, stated he had had extensive contact with Lieutenant Lotz and did not believe it was "appropriate" for him to sit as a member of the court. Ultimately he was challenged for cause by the defense without objection by the Government. Major Williams, a white, was seated without challenge. Major Beale, a white, was questioned and neither side had a challenge for cause. Major Cagiano, a white, had known about Lieutenant Lotz; and he was challenged for cause by the defense without objection by the Government.

Captain Emerson, a black, was successfully challenged for cause by the Government on grounds that gave rise to an issue that will be discussed later in this opinion. However, there is no showing that his race was related to the challenge in any way.

Second Lieutenant Luster, a black, was seated without challenge by either side. First Sergeant Baker, a black, was seated without challenge. Gunnery Sergeant Davenport, a black, was seated without challenge; Gunnery Sergeant Denoo, a white, was seated without challenge.

Staff Sergeant Edwards then testified on voir dire. When Edwards was asked by

---

3. As authorized by the Uniform Code of Military Justice, appellant had requested that enlisted persons be appointed to serve on his court-martial. Art. 25(c)(1), UCMJ, 10 USC § 825(c)(1).

4. For the fourth quarter of fiscal year 1987, during which *Curtis* was tried, the percentage of black officers in the Second Marine Division was 5.5; the percentage of black enlisted persons was 23.9; and the percentage of combined black officers and enlisted was 22.9. The range of black officer percentages in other commands was from 2.0 to 11.4; the range in the percentage of black enlisted persons was from 17.0 to 25.8; and the range in the percentage of combined black officers and enlisted was from 14.5 to 25. As of July 1991 the percentage of black officers in the Marine Corps is 5.1; the percentage of black enlisted personnel is 20.1; and the percentage of combined black officers and enlisted is 18.6.

5. Appellant's case was tried after the United States Air Force Court of Military Review had ruled that a court member who rated another member was subject to a challenge for cause and prior to our contrary decision on this issue. *United States v. Murphy*, 23 MJ 690, 764 (1986), *rev'd*, 26 MJ 454 (CMA 1988).

trial counsel whether he agreed with the proposition "that the Government must prove th[e] accused's guilt beyond a reasonable doubt and if the Government" fails to do so, "the accused should be acquitted," he said he did not "understand the question." Then, after an explanation of "reasonable doubt," Edwards stated that he understood what trial counsel meant. After a variety of other questions, trial counsel closed in this manner:

> I'll just ask one general question, Staff Sergeant. How do you feel about, again, being—sitting here as a member in this case? Do you have any feelings about it pro/or con or whatever? Your own words.
>
> MEM(SSGT EDWARDS): I feel, sir, basically that it would be to me a learning experience. And coming in with an open mind, being able to give everything, weighing out everything, and listening to all the facts before I finally say whether a person is innocent or guilty, it would be a good experience for me and something that I would like to go through, sir.
>
> TC: You'd also agree that not—it's not only would be a learning experience, it would be a very, very serious responsibility?
>
> MEM(SSGT EDWARDS): Yes, sir.
>
> TC: Possibly one of the more serious responsibilities in your whole life?
>
> MEM(SSGT EDWARDS): Yes, sir.

Defense counsel asked no questions and interposed no challenges for cause.[6]

Sergeant Justice, a white, was then questioned and no challenge for cause was made. Finally, Corporal Fields, a white, was seated without challenge. Subsequently, the military judge granted the defense challenge of Colonel Van Ryzin for cause and asked the Government if it wished to exercise a peremptory challenge.

---

**6.** The failure of defense counsel to ask any questions led to this colloquy:

> TC: I have no challenge for cause. I am somewhat concerned although about the defense counsel not voir diring two members, concerning the case.

When the Government challenged Staff Sergeant Edwards peremptorily, the defense objected and requested that the Government state on the record its reasons for the challenge because, like Curtis, Edwards was black. Trial counsel responded that he would not be obliged to disclose the reasons for his peremptory challenge since three black members would still be on the court after the challenge was granted.

After ascertaining that the defense did not intend to exercise its peremptory challenge, regardless of his ruling on the Government's peremptory challenge, the military judge recessed the trial to review the *Batson* case. After listening to the prosecutor's attempts to distinguish *Batson*, the military judge asked, "[C]an't the Government articulate its reasons?" Trial counsel replied, "I would be happy to, sir." The "articulation" provided thereafter was

> first of all, in my opinion Staff Sergeant Edwards' responses to the voir dire, while satisfactory, didn't indicate to me to be the kind of member that the government would want on this case and one thing particularly that he said, if I remember correctly, he said that he would consider this as a learning experience which, in the government's opinion, that was not the—while not challengeable for cause, that is why the Government chose to exercise its peremptory challenge on him.

The military judge then responded:

> Actually that's the only thing I had written down with regards to him. I think that was probably an unfortunate choice of words, but it certainly caused me to note it.

After ascertaining that the defense did not wish to be heard further, the judge ruled:

> MJ: Well I think Major Boyett is a lawyer of considerable experience and it is his responsibility to try his case.
>
> DC: There are very few questions that haven't been asked by the time that the trial counsel is over.
>
> MJ: Well, it might be a tribute to your competence and thoroughness, Major.

Of course, the convening authority specifically selected Staff Sergeant Edwards. During the challenge for cause there was certainly no evidence whatsoever that the challenges were based on any racial composition. With the challenge of Staff Sergeant Edwards there would still be three black members and the military judge finds that the reason stated by the government for exercising its peremptory challenge is at least one that is understandable; may not agree with it, but it appears to have enough foundation to satisfy the rule announced in *Batson v. Kentucky;* therefore, the objection by the defense counsel will be overruled.

In our view *Hernandez v. New York,* 500 U.S. ——, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), is dispositive of appellant's claim. There the defense had raised a *Batson* objection after the prosecutor had peremptorily challenged Hispanic potential jurors. The prosecutor then volunteered the explanation that he had rejected the jurors because "I feel very uncertain that they would be able to listen and follow the interpreter." The judge denied a defense motion for a mistrial; and the Supreme Court ultimately upheld the conviction.

Justice Kennedy, writing for himself and three other Justices, emphasized that under *Batson* a "racially discriminatory intent or purpose" must be shown; and this "implies that the decision-maker ... selected ... a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Thus, if the defense makes a prima facie showing of discrimination in the exercise of peremptory challenges by the prosecution, the prosecutor must offer a "neutral explanation," which "means an explanation based on something other than the race of the juror." Of course, if "a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination," it is a "moot" issue whether the defense has "made a prima facie showing." 111 S.Ct. at 1866.

According to Justice Kennedy, "great deference" must be given on appeal (111 S.Ct. at 1868) to a determination by the trial judge "that the prosecutor did not discriminate on the basis of" race or "ethnicity," the test apparently being one of "clear error." *Id.* at 1871.

Justice O'Connor, with whom Justice Scalia joined, concurred in the judgment and agreed fully with the plurality that the Supreme Court should only "review for clear error the trial court's finding as to discriminatory intent" and that the "finding of no discriminatory intent was not clearly erroneous in this case." 111 S.Ct. at 1873.

■ With this guidance in mind, we have considered the military judge's ruling that the reasons stated by trial counsel had "enough foundation to satisfy" *Batson;* and it does not appear "clearly erroneous." The preceding events in the appointment and selection of the court members give no hint of any racial bias on the prosecutor's part. Trial counsel's reason for the peremptory challenge—although, as everyone realized, it was not an adequate basis to challenge for cause—does not appear to be a mere pretext used by the prosecutor to conceal a racially motivated purpose. The military judge himself had noted the reference by Staff Sergeant Edwards to the "learning experience" that he would receive.

Although service as a court-martial member or as a juror can be a "learning experience," the focus by Sergeant Edwards on the benefit to him from sitting as a court member may have seemed especially incongruous to the prosecutor in a death penalty case. Certainly many court members might have been more concerned with the awesome responsibility they would assume than with the "learning experience."

Under the view stated by Justice O'Connor in her separate opinion in *Hernandez,* "[a]bsent intentional discrimination violative of the Equal Protection Clause, parties should be free to exercise their peremptory strikes for any reason, or no reason at all."

111 S.Ct. at 1874. Under this view, any explanation for the exercise of a peremptory challenge would suffice—however whimsical it might be; and the role of the explanation by the prosecutor is simply to provide evidence that no racially "discriminatory intent" existed.

According to the rationale offered in the plurality opinion of Justice Kennedy, it would also seem that the race-neutral explanation has no independent significance and is only important as evidence that the prosecutor's peremptory challenge was not racially motivated. However, even if the prosecutor's explanation has to demonstrate that there is a logical basis for exercising the peremptory challenge, we believe this requirement was met here.

Finally, we note that—unlike the explanation offered in *Hernandez*, where the reason offered by the prosecutor would probably have had a disparate effect on Hispanic potential jurors—[7] the explanation offered by trial counsel in this case would have had no tendency towards a "disparate impact" on a "cognizable racial group." In short, there would be no greater likelihood that a black more than a white would be interested in serving on a death case because of the "learning experience" involved. Under these circumstances and giving due deference to the military judge's determination, we must reject appellant's *Batson* challenge.

## II

## THE CHALLENGE FOR CAUSE TO CAPTAIN EMERSON

■ Prior to the peremptory challenge of Staff Sergeant Edwards, Captain Emerson, also a black, had been challenged by the prosecution because his religious belief made "it extremely difficult" for him to vote for a death penalty, although he could "consider it." By further questions, trial counsel clarified Captain Emerson's state of mind in this way:

TC: So you, under no circumstances, because of your religious beliefs could vote for a penalty of death regardless of the facts and circumstances of the case?
MEM(CAPT EMERSON): Yes, sir.
TC: You could consider it, but you could not vote for it?
MEM(CAPT EMERSON): Yes, sir.
TC: Because of your religious beliefs?
MEM(CAPT EMERSON): Yes, sir.
TC: And that's the truth from the bottom of your heart, is it not?
MEM(CAPT EMERSON): Yes, sir.
TC: Captain Emerson?
MEM(CAPT EMERSON): When he asked me do I consider it, I said "I'd consider it." But once again, *I will always go with the other option.*

(Emphasis added.)

The military judge then received an affirmative answer to this question:

Now, considering the prefatory remarks of Major Boyett, we got to the point in which you were called upon to cast your vote either for the death penalty or for the other alternative punishment. Do I correctly understand that you would in all events cast your vote for the alternative punishment?

Thereafter, in granting the challenge for cause, the military judge stated that Emerson "does have an inelastic attitude," and that, although he "would consider" capital punishment, "I don't think that that consideration would be a meaningful one anyway, and that, notwithstanding his sincerity, he would be compelled to vote for the alternate punishment."

We agree fully with the analysis of the court below, which ruled that the military judge had properly granted the challenge for cause. 28 MJ at 1086–88. In *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the Supreme Court held that in a death case the Government may challenge a juror for cause if, because of his religious views, he never, under any circumstance, would vote to im-

---

**7.** This is at least in part the complaint of Justice Stevens in his dissent for two other Justices in

*Hernandez v. New York,* —— U.S. ——, 111 S.Ct. 1859, 1877, 114 L.Ed.2d 395 (1991).

pose the death penalty. Subsequently *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), and *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), ruled that a juror may be challenged for cause when his views about capital punishment would prevent or substantially impair the performance of his duties as a juror. Thus, unlike *Witherspoon*'s limit of the challenge for cause to jurors who would "automatically" vote against the death penalty, under *Adams* a less rigorous standard is imposed. The Government need only establish the great likelihood that, because of his religious views or moral scruples, the juror would not be able to give meaningful consideration to imposing a death penalty. *See also Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Here the prosecution made that showing to the reasonable satisfaction of the military judge.

## III

## THE SENTENCING INSTRUCTIONS

In our previous opinion in this case, we discussed the sentencing procedures provided by RCM 1004 and held that they were constitutionally permissible. We now have reviewed the instructions in this case to determine whether they complied with the intent of RCM 1004.

The military judge reviewed the three aggravating factors on which the Government relied. He reminded the members that they all must agree beyond a reasonable doubt, that a unanimous vote was required to find an aggravating factor, and that the vote on each aggravating factor must be by secret written ballot of all members. The judge also informed the court members that, unless they found "unanimously that at least one of the aggravating factors existed," they could "not adjudge a sentence to death." Moreover, they were told that, even if an aggravating factor were found to exist, "you may not adjudge a sentence to death unless you find that any and all extenuating or mitigating circumstances are substantially outweighed by any aggravating factors as you have found existed in the first step of this procedure." After explaining that the members "must ... consider all matters in extenuation and mitigation and balance them against the aggravating factors," the judge outlined some of the mitigating circumstances that the defense had presented—such as the absence of a criminal record and appellant's church activity.

As we read the judge's instructions, the court members were free to consider any mitigating circumstances. There was no requirement that the members make any finding—by unanimous vote or otherwise—as to the existence of any particular mitigating circumstance. *McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). The members were informed that they were not free to adjudge a death sentence unless they found "that any and all extenuating or mitigating circumstances [were] substantially outweighed by any aggravating factors"; but they were not directed to adjudge a death sentence if they determined that the aggravating circumstances did outweigh the extenuating and mitigating circumstances. In short, in many respects the instructions by the military judge—like the sentencing procedure established under RCM 1004— were more favorable to the accused than was constitutionally required.[8]

---

8. In light of RCM 1004(b)(4), the Court of Military Review upon remand should consider these matters. First, is there a requirement that the findings state explicitly that all members concur that any extenuating or mitigating circumstances are substantially outweighed by the aggravating factors found by the members? Second, does the statement in the instructions that "you may not adjudge a sentence of death unless you find that any and all extenuating or mitigating circumstances are substantially out- weighed by any aggravating factors ..." sufficiently inform the members that this finding must be unanimous? Third, must there be an *explicit* instruction to the effect that, even if the members unanimously find one or more aggravating factors and even if the members unanimously determine that the extenuating or mitigating circumstances are substantially outweighed by the aggravating factors, they still have the absolute discretion to decline to impose the death sentence?

## IV

## COMPUTATION OF AGGRAVATING FACTORS

In one respect, however, the procedure employed may have prejudiced Curtis. As we noted in our earlier opinion, three "aggravating factors" were found by the members. In substance they were: 1) "the premeditated murder of" Mrs. Lotz "was committed while [Curtis] was engaged in the commission of a burglary"; 2) "with regard to the premeditated murder of" Mrs. Lotz, Curtis had "been found guilty in the same case of another murder"—that of Lieutenant Lotz; and 3) "with regard to the premeditated murder of" Lieutenant Lotz, Curtis had "been found guilty in the same case of another murder"—that of Mrs. Lotz. 32 MJ at 269.

As we observed in our earlier opinion, several cases have ruled that, when an accused is tried in a single trial for two premeditated murders, there is "a double counting of 'aggravating factors'" if each murder is considered to "aggravate" the other. Cf. People v. Harris, 36 Cal.3d 36, 201 Cal.Rptr. 782, 801, 679 P.2d 433, 452 (1984), cert. denied, 469 U.S. 965, 105 S.Ct. 365, 83 L.Ed.2d 301 (1984); Wilson v. State, 250 Ga. 630, 300 S.E.2d 640, 648, cert. denied, 464 U.S. 865, 104 S.Ct. 199, 78 L.Ed.2d 174 (1983); State v. Goodman, 298 N.C. 1, 257 S.E.2d 569 (1979). On consideration of RCM 1004 and of these precedents, we doubt that the President intended for commission of a double murder to constitute two "aggravating factors," rather than only one.

■ In one respect the issue is academic. A single "aggravating factor" is sufficient to authorize the death penalty; and here the double murder of Lieutenant Lotz and his wife provides at least the one "aggravating factor" minimally necessary to permit imposition of a death penalty. Moreover, if we set aside an "aggravating factor" which the court-martial found to exist, this does not require resentencing at the trial level, so long as at least the find-ing of one "aggravating factor" can be affirmed. Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990).

■ However, we recognize that the number of "aggravating factors" which the members of the court-martial unanimously find to exist may affect their willingness to impose a death sentence. Thus, if there had been six "aggravating factors" found by the court-martial, rather than only three, they might have been even more inclined to adjudge the death sentence; but if only one had been found, they might have been less willing to do so. Whether the number of "aggravating factors" in this case had any effect on the sentence can best be determined by the Court of Military Review on remand.

## V

## PROPORTIONALITY REVIEW

In its review of the case the Court of Military Review did not specifically undertake any type of "nontraditional proportionality review"—which some states require in capital cases. See Pulley v. Harris, 465 U.S. 37, 42–44, 104 S.Ct. 871, 875–876, 79 L.Ed.2d 29 (1984). See, e.g., Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). In our previous opinion, we noted that such a

review is not constitutionally required in civilian cases where the statutory procedures adequately direct the sentencing authority's exercise of discretion. See, e.g., McCleskey v. Kemp, 481 U.S. 279, 306, 107 S.Ct. 1756, 1774, 95 L.Ed.2d 262, 288 (1987); and Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). In view of the safeguards prescribed by RCM 1004, we are convinced that a "proportionality review" is not required by the Eighth Amendment, which prohibits "cruel and unusual punishments" or by Article 55, [UCMJ,] 10

USC § 855, which prohibits "cruel or unusual punishment."
32 MJ at 270.

■ The issue of the proper construction of Article 55 is academic.[9] My Brother Judges and I now agree that Article 66(c) of the Code, 10 USC § 866(c), which requires the Courts of Military Review to determine the appropriateness of court-martial sentences, encompasses a limited proportionality review of death sentences. Article 67 also imposes upon us the task of assuring that this review is properly performed by the court below.

We recognize that this is the first case decided under the procedural changes promulgated by the President in the Manual for Courts-Martial, United States, 1984, and, hence, there will be few, if any, cases in military or federal district courts which would be proper subjects for proportionality comparison.[10] However, the gravamen of the offenses here (i.e., double homicide during a burglary) is not unique to the military, and it would be fitting for the Court of Military Review to consider generally similar cases reviewed by the Supreme Court of the United States in which state courts have imposed the death penalty for like crimes on that basis. *See*

*United States v. Curtis*, 32 MJ at 270, 271. The Court of Military Review should determine whether the sentence here is appropriate for the crimes of which the accused stands convicted and whether the sentence is *generally* proportional to those imposed by other jurisdictions in similar situations. *See generally McCleskey v. Kemp*, 481 U.S. 279, 306–08, 107 S.Ct. 1756, 1774–76, 95 L.Ed.2d 262 (1987); *Pulley v. Harris*, *supra.*

## VI

## OTHER ISSUES

In various pleadings filed with this Court, issues have been raised as to the effectiveness of trial defense counsel and even of appellate defense counsel—at least as the latter initially performed before receiving various types of expert assistance.[11] Since it is necessary to remand this case to the Court of Military Review for reasons already stated, we think it best to let the Court of Military Review also consider these claims in the first instance.

In addition appellate defense counsel have now filed with us a number of "supplemental issues"—67 according to our

9. Subsequent to our earlier decision, the Supreme Court decided *Harmelin v. Michigan*, — U.S. —, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), which upheld imposition of a mandatory term of life in prison without possibility of parole as punishment for possessing 672 grams of cocaine. The defendant had contended "that his sentence is unconstitutionally 'cruel and unusual'" because it was "'significantly disproportionate' to the crime he committed" and because it was mandatory, "without taking into account the particularized circumstances of the crime and of the criminal." *Id.*, 111 S.Ct. at 2684.

In his lead opinion Justice Scalia noted that, although "[i]n 1791, five State Constitutions prohibited 'cruel or unusual punishments,' and two prohibited 'cruel' punishments, [t]he new Federal Bill of Rights ... tracked Virginia's prohibition of 'cruel and unusual punishments,' which most closely followed the" English Declaration of Rights of 1689. 111 S.Ct. at 2686 (citations omitted). In criticizing the rationale of *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), Justice Scalia observed that there, the majority had failed to recognize that the Eighth Amendment had prohibited only those

punishments that were both cruel *and* unusual and not those which had only one or the other feature. In this connection he further observed that "a disproportionate punishment can perhaps always be considered 'cruel,' but it will not always be (as the text also requires) 'unusual.'" 111 S.Ct. at 2687.

In our earlier opinion we also quoted from *Solem v. Helm, supra*, for guidance as to the performance of a "proportionality analysis." 32 MJ at 270. Although Justice Scalia criticizes *Solem v. Helm, supra*, and would limit its application to death cases, this portion of his opinion was concurred in only by the Chief Justice, while seven other Justices took differing views.

10. See *State v. Shaw*, 273 S.C. 194, 255 S.E.2d 799 (1979), cited in *United States v. Curtis*, 32 MJ at 270 n. 23.

11. As a result of orders by our Court, 31 MJ 395, 424 (1990), appellate defense counsel received funds for use in their discretion to obtain the assistance of "death qualified" civilian counsel, to retain expert consultants, or otherwise prepare their case.

count.[12] Some of these issues are obviously without merit—at least unless the Supreme Court overturns extensive precedent. For example, one questions "whether the court-martial procedures denied appellant of [sic] his Sixth Amendment right to jury trial and an impartial cross-section of the community." However, as to these "supplemental issues," we also think it best that the Court of Military Review have the first opportunity to rule on them.[13]

## VII

## DISPOSITION OF THE CASE

The decision of the United States Navy–Marine Corps Court of Military Review is set aside. The record of trial is returned to the Judge Advocate General of the Navy for remand to that court for further proceedings in accordance with this and the earlier opinion by our Court, including consideration of the "supplemental issues." If

that court then determines that no prejudicial error occurred as to the findings or sentence, it shall determine whether Curtis was prejudiced by the doubling up of "aggravating factors." If the court determines that he was not prejudiced thereby, it shall determine whether the death sentence is appropriate in this case, after conducting a proportionality review in accordance with Part V of this opinion.

Chief Judge SULLIVAN concurs.

COX, Judge (concurring):

I concur. However, I also believe that fundamental notions of fairness require that each member of the court-martial sign his or her name to the death-sentence worksheet or that the condemned accused should have the right to poll the members despite RCM 922(e), Manual for Courts–Martial, United States, 1984.

12. We recognize that defense counsel, in the proper performance of their duties, wish to assure that they do not waive any right of appellant to assert these issues in connection with any later collateral attack on the conviction and sentence. *Cf. McCleskey v. Zant,* 499 U.S. ——, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991). In view of the unique nature of a capital case and the importance of ensuring that every meaningful issue is judicially considered before a death

sentence is carried out, we have allowed the filing. *See* 34 MJ 21.

13. In view of our action here, so much of the order of the Court dated August 22, 1991, which grants appellate government counsel the opportunity to file a response before this Court is vacated. Of course, the Court of Military Review may permit such additional pleadings as they deem appropriate.