**UNITED STATES**

v.

**Ronnie A. CURTIS, 511 74 5202, Lance Corporal (E–3), U.S. Marine Corps.**

**NMCM 87 03856.**

U.S. Navy–Marine Corps Court of Military Review.

Sentence Adjudged 6 Aug. 1987.

Decided 31 Aug. 1993.

CDR Mary T. Hall, JAGC, USN, Appellate Defense Counsel.

Capt Dwight H. Sullivan, USMC, Appellate Defense Counsel.

LCDR John B. Holt, JAGC, USN, Appellate Defense Counsel.

Capt. A. Diaz, USMC, Appellate Government Counsel.

CDR Stephen A. Stallings, JAGC, USN, Appellate Government Counsel.

LCDR J. Richard Chema, JAGC, USN, Appellate Government Counsel.

LT T.S. Susanin, JAGC, USNR, Appellate Government Counsel.

En Banc.

STRICKLAND, Senior Judge:

The appellant was tried by officer and enlisted members in July and August of 1987. He was found guilty of two premeditated murders, larceny, burglary, indecent assault, damage to Government property, and disobedience of a general order, in violation of Articles 118, 121, 129, 130, 134, and 92, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 918, 921, 929, 930, 934, and 892, respectively. He was sentenced to death, and the convening authority approved the adjudged sentence.

This Court affirmed the findings and sentence. *United States v. Curtis*, 28 M.J. 1074 (N.M.C.M.R.1989) (en banc). The United States Court of Military Appeals remanded the case to this Court to determine whether the appellant was prejudiced by a doubling up of "aggravating factors," to determine whether there was ineffective assistance of trial defense counsel, to conduct a proportionality review, to once again determine whether the death sentence is appropriate, and to consider the supplemental issues [1] raised before the Court of Military Appeals. *United States v. Curtis*, 33 M.J. 101 (C.M.A.1991).

We have again reviewed the record of trial pursuant to Article 66(c), UCMJ, 10 U.S.C. § 866, and have determined that the assignments of error are without merit and that no prejudicial error was committed which affects the findings or sentence. Only the principal assignments of error will be discussed.

I.

A brief synopsis of the facts is necessary.[2] The appellant stabbed to death First Lieutenant James F. Lotz, appellant's officer-in-charge, and Mrs. Joan M. Lotz in the couple's quarters aboard Camp Lejeune, North Carolina in April of 1987. Lieutenant Lotz was stabbed once in the chest and once in the back. Mrs. Lotz was stabbed seven times in the head, neck, and back. Prior to the stabbings, the appellant consumed approximately one pint of gin and then decided to kill his Lieutenant because he believed that Lieutenant Lotz was racially prejudiced and was discriminating against him. The appellant planned the killings to the extent that he stole a K-bar knife from the supply warehouse, obtained a pair of gloves to avoid leaving fingerprints, stole a bicycle to ride to the Lotz house, and conceived a ruse that a fellow Marine was injured in order to gain entrance into the home. Following the stabbings, the appellant indecently fondled Mrs. Lotz's vagina as she lay dying on the floor and then ransacked the home, stealing money, car keys, and ultimately both of the Lotz' cars. The appellant was apprehended after wrecking one of the cars and eventually confessed to these offenses.

II.

Prior to trial, the Government informed the defense of its intent to prove two aggravating factors as required by Rule for Courts–Martial (R.C.M.) 1004(a)(1). The two aggravating factors set forth in this written notice were:

a. The murder of Joan M. Lotz was committed while the accused was engaged in the commission of a burglary; and

b. The accused, Lance Corporal Curtis, has been found guilty in the same case of another violation of Article 118.

Appellate Exhibit II.

During the sentencing phase of the trial, however, the Government proposed a sentence worksheet that contained three aggravating factors. Despite objection by the defense, these three aggravating factors were submitted to the members for their consideration. The factors were: (1) Mrs. Lotz was murdered during the com-

---

1. The identified issues (with the exception of sentence appropriateness) and the supplemental issues were raised for the first time before the Court of Military Appeals. There are now 73 supplemental issues before us. The entire list of 77 issues which we have considered on re-

mand is contained in the appendix to this decision.

2. A more complete recitation of the facts can be found in our original opinion. *Curtis*, 28 M.J. at 1077.

mission of a burglary; (2) with respect to the murder of Mrs. Lotz, the appellant was found guilty in the same case of another murder; and (3) with respect to the murder of Lieutenant Lotz, the appellant was found guilty in the same case of another murder. Appellate Exhibit LX.

■ Both opinions of the Court of Military Appeals questioned whether there was a double counting of aggravating factors with respect to the second and third factors asserted. *See Curtis*, 33 M.J. at 108; *United States v. Curtis*, 32 M.J. 252, 269 (C.M.A.1991). The appellant argues that the question has been decided in the affirmative since the Court directed us to determine whether prejudice resulted from a doubling up of aggravating factors. The Government simply asserts that there was no prejudice. We need not determine whether the Court of Military Appeals has decided this issue because we conclude that there was a double counting of aggravating factors in this double homicide case where each murder was considered to aggravate the other. *See People v. Harris*, 36 Cal.3d 36, 201 Cal.Rptr. 782, 679 P.2d 433 (1984), *cert. denied*, 469 U.S. 965, 105 S.Ct. 365, 83 L.Ed.2d 301 (1984); *Wilson v. State*, 250 Ga. 630, 300 S.E.2d 640 (1983), *cert. denied*, 464 U.S. 865, 104 S.Ct. 199, 78 L.Ed.2d 174 (1983); *State v. Goodman*, 298 N.C. 1, 257 S.E.2d 569 (1979). Consequently, we set aside the third aggravating factor. In doing so, however, we also conclude that the remaining aggravating factors were unanimously found to exist by the members and that their findings were factually and legally correct.

The remaining question is whether the double counting resulted in prejudice. As a preliminary matter, however, we must determine whether this Court can assess prejudice resulting from an invalid aggravating factor where the members weighed this factor in arriving at a sentence of death. The United States Supreme Court has answered this question in *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), where it was held that the Constitution does not preclude an appellate court from upholding a death sen-

tence where an invalid aggravating factor was before the sentencing authority as long as the appellate court either reweighs the aggravating and mitigating circumstances or finds the error to be harmless beyond a reasonable doubt. *Accord Sochor v. Florida*, — U.S. —, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992) (remanded because the State Supreme Court did not explain that the error was harmless beyond a reasonable doubt). The Court cautioned, however, that "[o]ur holding is only that such procedures are constitutionally permissible. In some situations, a state appellate court may conclude that peculiarities in a case make appellate reweighing or harmless-error analysis extremely speculative or impossible." *Clemons*, 494 U.S. at 754, 110 S.Ct. at 1451.

The appellant asserts that we are precluded from reweighing in this case because the remand order directed us to determine whether the appellant was prejudiced. He further asserts that we cannot find harmless error because of a heightened threshold for doing so in a death penalty case, because of a tip in the scales which renders mitigation more weighty in the absence of one of the aggravating factors, because of a lack of specific identification of the mitigating evidence considered by the members, and because a former Chief Judge found the death sentence to be inappropriate when the case was before this Court the first time. The Government contends that the remaining aggravating factors would have been sufficient to sustain a death penalty and that the members were not in any way misled by the invalid factor. We agree with the Government's position.

■ Although reweighing at the appellate level is permissible, we choose to perform a harmless error analysis since the members were the sentencing authority in this case and they weighed aggravating factors against mitigating circumstances. The U.S. Supreme Court requires "close appellate scrutiny of the import and effect of invalid aggravating factors" in a weighing jurisdiction, and "in order for a[n] ... appellate court to affirm a death sentence

after the sentencer was instructed to consider an invalid factor, the court must determine what the sentencer would have done absent the factor." *Stringer v. Black,* — U.S. —, — – — 112 S.Ct. 1130, 1136–37, 117 L.Ed.2d 367 (1992). In other words, we will not substitute our judgment for that of the members. To affirm the death sentence, we must be convinced beyond a reasonable doubt that the members still would have sentenced the appellant to death if only two aggravating factors existed instead of three aggravating factors. *Cf. United States v. Peoples,* 29 M.J. 426 (C.M.A.1990); *United States v. Sales,* 22 M.J. 305 (C.M.A.1986); *United States v. Suzuki,* 20 M.J. 248 (C.M.A.1985). The fact that we will not substitute our judgment for the members' renders moot the argument of appellant that we cannot find harmless error because a former Chief Judge found the death sentence to be inappropriate in this case. His judgment on that issue is not relevant to our harmless error analysis.

What is relevant is whether the invalid aggravating factor somehow misled the members or "tipped the scale" in the weighing process. The appellant cites several cases in which a harmless error analysis was employed by an appellate court and the cases were remanded for a new sentencing hearing. He contends that a new hearing on sentence is likewise required in this case. *State v. Terry,* 813 S.W.2d 420 (Tenn.1991), is typical of those cases where remand was necessary. In *Terry,* the jury found two aggravating factors; that the murder was especially heinous, atrocious, or cruel and that it was committed during a larceny. In a post-trial proceeding, the trial judge found, and the appellate court agreed, that the evidence did not support a finding that the murder was committed in the course of a larceny. Thus, there remained only one valid aggravating factor. In finding that the erroneous aggravating factor was not harmless beyond a reasonable doubt, the Court expressed doubt about its ability to determine what the jury

would have done if one of two factors had been withdrawn and there remained only one aggravating factor to weigh against the mitigating circumstances. They contrasted that situation with a case in which only one of three aggravating factors had been invalidated, and they found the error to be harmless beyond a reasonable doubt.[3] Implicit in that comparison is the fact that some consideration was given to the number of aggravating factors remaining after one had been held to be invalid. Where only one remained, the Court concluded that it could not be confident that the jury still would have imposed the death penalty.

This case can be distinguished from *Terry* in two significant ways. First, two aggravating factors remain after invalidating the erroneous factor. Second, the factor being invalidated is not completely different from the remaining factors as was the case in *Terry.* In our view, the second and third aggravating factors are simply identical. Each, in essence, states that a double homicide was committed in this case and conforms to the aggravating factor set forth in R.C.M. 1004(c)(7)(J).

*Harris v. Pulley,* 692 F.2d 1189 (9th Cir. 1982), was a double homicide case in which the state charged Harris with three special circumstances (equivalent to aggravating factors) for each murder (a total of six special circumstances). The jury found the existence of all six special circumstances even though each of the three was duplicated as to the second murder. In considering whether this required reversal, the Court found:

We conclude that the jury could not have been misled in this case by the duplicative charging of special circumstances. It was clear throughout the trial that two murders, not four, were committed and that both murders arose out of one incident. It is highly unlikely that the jury simply counted up the special circumstances charged and based its verdict on such calculation. We cannot

---

3.  *State v. Bobo,* 727 S.W.2d 945 (Tenn.1987). A similar result was reached by the Florida Supreme Court in *Thompson v. State,* 619 So.2d 261, 266 (1993), where the Court held that vacating one of four aggravating factors was harmless error.

reverse on the basis of speculation of that nature.

*Harris*, 692 F.2d at 1203, *rev'd on other grounds*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).

The California Supreme Court has consistently followed the principle of *Harris*, concluding that a jury could not have reasonably given any significant independent weight to aggravating factors which were multiplied by the number of murders. *See People v. Bonin*, 46 Cal.3d 659, 250 Cal. Rptr. 687, 758 P.2d 1217 (1988) (en banc) (the jury considered four special circumstances instead of one where four murders were committed); *People v. Hamilton*, 46 Cal.3d 123, 249 Cal.Rptr. 320, 756 P.2d 1348 (1988) (en banc) (the jury considered six special circumstances [two for each homicide] instead of one).

■ We conclude that this case is analogous. It was clear to the members during the entire trial that the double homicide of Lieutenant and Mrs. Lotz was committed during the single encounter with the appellant. The members convicted the appellant of both murders by a unanimous vote so there could not have been a mistake in their minds as to how many murders took place. We likewise believe beyond a reasonable doubt that the members were not at all affected by this duplicate aggravating factor when they weighed the aggravating factors against the mitigating circumstances. It is the very fact that the appellant killed two people that aggravates the nature of his crime. Duplicating this fact as another aggravating factor was merely surplusage that added nothing more than was already before the members. Thus, we conclude that the members could not have reasonably given any weight to the aggravating factor we have set aside.

R.C.M. 1004 does not require the members to make specific findings as to mitigating circumstances (which allows individual members the opportunity to consider anything they wish as mitigating), and, as a result, we do not consider the process of weighing to be a numbers game of comparing the number of aggravating factors with the number of mitigating circumstances. Consequently, the elimination of an aggravating factor does not somehow alter some mathematical calculation by the members. Thus, we are convinced that the "scale was not tipped" by the invalid aggravating factor.

Based on the facts and circumstances of this case, we conclude that the double counting of one aggravating factor was harmless beyond a reasonable doubt.[4]

### III.

The appellant contends that he was denied his Sixth Amendment right to effective assistance of trial defense counsel. In particular, he asserts that his counsel failed to conduct an adequate pretrial background investigation which would have revealed certain influences on the appellant as he was growing up that might have helped to explain his actions or militate against the death sentence, that his counsel failed to adequately present and argue the defense of voluntary intoxication or to offer alcohol abuse as a mitigating circumstance, and that his counsel failed to present a competent defense (by failing to move for a change of venue, failing to voir dire two members, failing to "humanize" the appellant and present a "case for life," failing to present an adequate argument on sentence, and failing to present the R.C.M. 706 board report in post-trial clemency). The Government contends that the defense team developed and presented a competent defense and their representation was not deficient. In the alternative, they argue that even if the counsel were deficient the appellant has failed to establish prejudice.

The standard of review to establish ineffective assistance of counsel is the two-pronged test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674

---

4. The dissent concludes that a harmless error analysis is not appropriate in this case and proposes commutation of the death sentence to life imprisonment as a remedy. If future reviewing authorities should agree with the dissent's position on a harmless error analysis, the appropriate remedy would be a rehearing on sentence rather than a commutation of the sentence.

(1984) (a capital murder case in which the death sentence was imposed, and the strategy of the defense counsel during the sentencing hearing was subsequently challenged). First, it must be shown that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense. "[T]he performance inquiry must be whether counsel's assistance was reasonable considering all of the circumstances." *Id.* at 689, 104 S.Ct. at 2065. Satisfying the second prong "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687, 104 S.Ct. at 2064. Satisfaction of the second prong has also been described as showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068. However, "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Lockhart v. Fretwell*, —— U.S. ——, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).[5]

While this case was initially pending before the Court of Military Appeals, that Court ordered the Judge Advocate General of the Navy to make available the sum of $15,000 to ensure adequate assistance to the appellant. *See United States v. Curtis*, 31 M.J. 395 (C.M.A.1990) (interlocutory order). Appellate defense counsel utilized a portion of these funds to hire a sociologist to conduct a background investigation and to prepare a report on the social history on the appellant. In addition, a portion of the funds was used to conduct a psychiatric evaluation of the appellant. After extensive interviews with the appellant, family members, teachers, and friends, all of whom appeared to be honest and forth-

right in responding to questions, the sociologist concluded that a combination of the appellant's rejection by his natural mother at birth, removal from a foster-home at age two-and-one-half years, emotional and physical abuse by his adoptive parents, an incident of a sexual molestation attack, and a genetic predisposition to alcohol abuse combined to bring the appellant to the breaking point on the night in question. Affidavit of Hans Selvog dated 5 July 1991 (filed with the Court on 20 August 1992) at 25, 26. The psychiatrist characterized the appellant as one who avoids interpersonal relationships, conceals his anger, and holds grudges. He opined that the appellant was alcohol-dependent and alcohol helped break down his control mechanisms which he used to control aggressive behavior. Psychiatric Evaluation of Dr. Goodwin dated 25 June 1991 (filed with the Court on 20 August 1992) at 3.

The appellant argues that the defense counsel's failure to conduct an adequate background investigation resulted in a failure to place this information before the members and that this information tended to explain why the offenses were committed and could either have served to decrease the appellant's culpability or to militate against a sentence to death. The Government contends that a strategically reasonable defense theory was presented, both on the merits and in extenuation and mitigation, that was consistent with the information available to them at the time.

Prior to trial, the defense counsel obtained the services of an expert clinical psychologist and board certified psychotherapist, Doctor Engelstatter. Doctor Engelstatter performed a psychological evaluation of the appellant and testified on a motion attacking the impartiality of the members detailed to the case. A board

---

5. We note that the applicability of the "American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases" has not been raised by the appellant as to the trial defense counsel, and we need not decide its applicability in this case since the Guidelines were adopted in February of 1989, after this case had been tried. The resolution adopting these Guidelines provided for exceptions to the Guidelines as might be appropriate in the military. It is also unnecessary for us to address whether such an exception exists. *But see U.S. v. Gray*, 32 M.J. 730 (A.C.M.R.1991).

was convened pursuant to R.C.M. 706.[6] The board report, including a psychological examination by a Navy clinical psychologist, was available to the defense before trial. The affidavits of both trial defense counsel indicate that they had frequent contact with the appellant prior to trial and contacted extenuation and mitigation witnesses by telephone and letter, as well as personally interviewing those who ultimately testified. In addition, the appellant's confessions to the authorities and the criminal investigation of the incident were available to counsel.

From these sources, there is no doubt the defense counsel knew considerable information about the appellant and the crimes at the time of trial. The 706 board found that the appellant did not lack mental responsibility for the charged offenses and did not lack the capacity to stand trial. This report, the evaluation by the defense expert, and the appellant's confession were all consistent in one area. Each detailed the appellant's belief that Lieutenant Lotz was racially prejudiced and treated the appellant in a discriminatory manner. Specific instances of perceived maltreatment by the Lieutenant were described. The evaluation by the defense expert revealed that the appellant first had thoughts of killing Lieutenant Lotz as early as December of 1986 and attributes the appellant's motive as revenge or vengeance. Alcohol was believed to have lowered the appellant's inhibitions and to have been a catalyst to the offenses. However, the experts did not believe that alcohol played any more significant role in the crimes. In fact, the 706 board specifically found that alcohol did not incapacitate the appellant to the point

where he could not premeditate his behavior; to the contrary, it found that the appellant had planned his acts for at least forty-five minutes prior to their occurrence. The experts also agreed that the appellant suffered from periodic alcohol abuse and a schizoid personality trait (one psychologist diagnosed a schizoid personality disorder). There was evidence that the appellant's parents were strict and that he was raised in a disciplined and religious environment; that his crimes were out of character with any past behavior; that the appellant was insecure, shy, and withdrawn; and that he did not have a good relationship with his adoptive father. The appellant expressed feelings of overt anger toward his adoptive father because of the adoptive father's domination and control over him. None of the extenuation and mitigation witnesses alluded to a dysfunctional relationship between the appellant and his adoptive father or between the adoptive father and other members of the family. Finally, the defense counsel were aware that the appellant felt no remorse for the killings.[7]

With this knowledge, counsel decided upon a defense theory both as to the merits and as to sentencing. The theory was that Lieutenant Lotz was a racist[8], that he discriminated against the appellant and other blacks, and that, due to the shy and sensitive nature of the appellant, this discrimination destroyed his dignity and caused an overwhelming amount of anger and rage to the point that the appellant, driven by passion, killed the Lieutenant. Additionally, the theory was that the appellant was surprised by the appearance of Mrs. Lotz and killed her as a part of the continuing rage against Lieutenant Lotz. Thus, the de-

---

6. A R.C.M. 706 board inquires into the mental capacity or mental responsibility of the accused.

7. The lead defense counsel stated in a post-trial affidavit that the appellant had no remorse for the murders. In addition, during the course of the trial, the appellant, in very specific terms, expressed his disdain for the family members of the victims who were present at trial. The appellant made this comment to his "chaser" (guard), and the "chaser" informed the prosecutor. The prosecutor relayed this information to the defense counsel, and it had a direct impact on their trial strategy.

8. The theory that Lieutenant Lotz was a racist was dealt a severe blow at trial by a surprise rebuttal witness. The witness, a black, had lived with Lieutenant and Mrs. Lotz for three months while helping Mrs. Lotz coach a basketball team. He was treated like a member of the family, and he opined that the Lieutenant was not prejudiced. The assistant defense counsel has indicated in a post-trial affidavit that this witness was unknown to the defense at the time of trial and his identity could not have been reasonably discovered before trial.

fense argued that the killing of the Lieutenant was manslaughter (they were successful in convincing the military judge to give a manslaughter instruction) and the killing of Mrs. Lotz was unpremeditated murder. Had this strategy worked, the appellant would not have been convicted of any crime for which the death penalty could be awarded. If the strategy failed on the merits, the defense hoped to use this as the motive for the murders and, coupled with the appellant's religious upbringing and prior peaceful nature, convince the members that the crimes were completely out of character and, therefore, a life sentence was appropriate.

On appeal, the appellant asserts that the proper strategy to have been employed in this case, relying on the extensive history developed by Mr. Selvog, was to explain why the murders occurred based upon the appellant's genetic, psychological, and environmental influences. The appellant contends that this strategy would have revealed his genetic predisposition to becoming an alcoholic, the fact that he was emotionally traumatized by his alcoholic adoptive father resulting in a destruction of his self-worth,[9] and the fact that his treatment by Lieutenant Lotz was in many ways repetitive of the abuse by his adoptive father. He argues that these influences, combined with alcohol as a catalyst, brought him to the breaking point and that, if the members had been aware of this, the resulting sentence might have been different.

While a very accurate and complete social history and psychological profile of the appellant presently exists, we must be careful not to rely solely on this information in analyzing the performance of counsel. As the U.S. Supreme Court has stated:

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *Cf. Engle v. Isaac*, 456 U.S. 107, 133–134, 102 S.Ct. 1558, 1574–1575, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *See Michel v. Louisiana, supra,* 350 U.S., at 101, 76 S.Ct., at 164. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. *See* Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U.L.Rev. 299, 343 (1983).

*Strickland,* 466 U.S. at 689–90, 104 S.Ct. at 2065–2066 *quoted in United States v. Brothers,* 30 M.J. 289, 291–92 (C.M.A.1990).

■ In assessing counsel's performance in this case utilizing the foregoing standard, we must examine whether the defense theory at trial was reasonable based on the information available to counsel at

---

**9.** The investigation by Mr. Selvog revealed much information concerning the adoptive father's relationship with the appellant. The adoptive father, an alcoholic, imposed corporal punishment on the appellant by whipping him with a belt. This occurred most frequently in connection with the appellant wetting his bed, a condition that began when he was initially adopted and persisted until the appellant reached high school. The adoptive father also maintained an affair with another woman outside the marriage, and the appellant and his mother and sisters were aware of this affair. The adoptive father established some form of emotional bond with the children of his paramour to the detriment of his own children to whom he showed no emotion except anger. These and other factors led the appellant to feel anger and resentment toward his adoptive father.

that time and whether counsel had a duty to discover additional information which might have led to a different theory because there were "road signs" in the psychological reports. The fact that the defense counsel portrayed the appellant as having come from a loving, caring, Christian home was a result of the appellant's friends and family either providing this information or withholding information to the contrary.[10] This portrayal, however, was consistent with the appellant's prior peaceful nature and was consistent with the theory that the appellant only acted out of character because Lieutenant Lotz' discriminatory treatment drove him to the breaking point. Certain of Lieutenant Lotz' actions and words, which the appellant thought were racist, could be corroborated by other witnesses, even though these witnesses might not have agreed with the appellant's perceptions. Thus, the available evidence tended to support the theory ultimately advanced by counsel.

The appellant asserts that counsel had a duty to discover additional information concerning his relationship with his adoptive father because there were "road signs" in the psychological reports. We disagree. "Most claims of failure to investigate ... must be appraised in light of the information available to the attorney.... Realistically, a defense attorney develops his case in large part from information supplied by his client." *United States v. Decoster,* 624 F.2d 196 (1976) (en banc), *cert. denied,* 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 311 (1979). The appellant's expert, Dr. Engelstatter, apparently did not feel this information was significant enough to pursue, and the appellant himself withheld facts which he now deems important to his case. We believe that based on the information available at the time of trial, the defense counsel presented a strategically reasonable defense theory—one that had the potential to reduce the appellant's culpability and liability as to sentence. The fact that this strategy did not work, using hindsight sharpened by facts discovered after the

trial, does not render it unreasonable or ineffective.

Even if all of the background information about the appellant had been known by the defense counsel, we would still not fault counsel's decision to follow the theory of defense presented in this case because it still would have been a reasonable strategy despite the alternative theory that might have been presented. In other words, it would not have been unreasonable for the defense to choose the discrimination theory over the abused child/psychological make-up theory, particularly where counsel believed a favorable panel of members had been detailed. We conclude that the appellant has failed to overcome the presumption that his counsel's actions "might be considered to be sound trial strategy" and has failed to overcome the presumption that his counsel's conduct fell within the wide range of reasonable professional assistance.

■ We reach the same conclusion with respect to the defense approach to intoxication. The appellant contends that the defense should have called an expert to extrapolate his blood-alcohol level at the time of the crimes from the level obtained by the police at 0800 the following morning and that this information should have been utilized to attempt to prove that the appellant was unable to form the specific intent necessary to be convicted of premeditated murder. While this contention has a superficial appeal at first glance, it ignores the evidence.

The evidence of premeditation in this case was absolutely overwhelming. All of the appellant's confessions detail the planning undertaken to carry out these offenses, from stealing a K-bar knife and obtaining a pair of gloves to avoid fingerprints to formulating a ruse to gain entry into the Lotz home. Additionally, the experts who evaluated the appellant opined that he was not so incapacitated that he could not premeditate the offenses. The

10. It is not particularly surprising that a family would not initially reveal any form of dysfunction within the family, even when their child faced serious charges. This information could be perceived as embarrassing, humiliating, or insignificant.

appellant had a history of alcohol abuse which likely increased his tolerance above that of the average person. Finally, the evidence indicated that the appellant filled a canteen full of gin and took it with him to the Lotz home but did not consume any prior to the crimes. The evidence is silent as to whether any alcohol was consumed after the murders and this possibility could not be excluded in an extrapolation of the blood-alcohol level. Consequently, any attempt to define the actual blood-alcohol level would have been of little benefit to the defense.

The argument that an expert was needed to interpret a specific blood-alcohol level is not compelling either. It was not unreasonable for the defense to rely on the everyday experience of the members regarding alcohol intoxication. We presume that the members were familiar with the levels of intoxication necessary to be driving under the influence, and we further presume that the members' military experiences made them familiar with the effects of intoxication as it relates to a lessening of inhibitions and its effect on judgment.

As a result, we conclude that counsel's action in merely referring to the appellant's blood alcohol level during argument was reasonable under all of the facts of this case.

■ Finally, turning to the assertion that the defense presented was generally incompetent, we again conclude that the appellant has not met his burden. Counsel's decision not to seek a change in venue (although such a motion had been filed) or to voir dire two of the members was consistent with the theory of defense. Of the fifteen members detailed to this case, six were black. The defense believed that a black member would be much more sensitive and sympathetic to a defense of racism and discrimination and believed it was essential to keep as many black members on the ultimate panel to hear the case as possible. They concluded that seeking a change in venue might result in a less favorable ratio of black members than had been detailed and avoided the voir dire of two black members so as to preclude exposing

an area that might subject the member to a challenge by the Government. While not completely successful in this endeavor (two black members were successfully challenged for cause and one peremptorily), the panel who ultimately heard the case was made up of six white and three black members. The defense needed only one vote from any of the nine members to prevent the imposition of the death sentence. Once again, the fact that this strategy was not ultimately successful is not dispositive of the issue. Under these circumstances we find the defense counsel's actions reasonable.

■ We find no merit in the further allegations that the defense was generally incompetent. We conclude that counsel aggressively pursued pretrial motions and presented a defense theory, both on the merits and during sentencing, that was both reasonable and consistent with a case for life. Witnesses and character evidence presented in extenuation and mitigation presented a strong case to spare the appellant's life. Voluminous matters were submitted to the convening authority after trial in support of a life sentence instead of death. Under all of the facts and circumstances of this case, we conclude that trial defense counsel's representation was not deficient and that the appellant has failed to satisfy the first prong of *Strickland.*

■ We further conclude, however, that even if we were to find counsel's performance deficient in one or all of the areas alleged, we would nonetheless be convinced that there is no probability that the result of this proceeding would have been different. We are satisfied that the defense would not have been successful in averting the death penalty even if the abused child/psychological make-up theory had been presented to the members. Revealing every fact concerning the appellant's background that has been discovered subsequent to trial would not have made a difference in this case. We believe that the aggravating nature of these offenses would still far outweigh all of this information, considered in a light most favorable to

the appellant, and other mitigating circumstances. We are convinced that the appellant received a fair trial with a reliable result. Thus, the appellant has also failed to satisfy the second prong of *Strickland.*

## IV.

The Court of Military Appeals directed us to determine "whether the sentence is *generally* proportional to those imposed by other jurisdictions in similar situations." *Curtis,* 33 M.J. at 109. In so directing, the Court recognized that there would be few, if any, military cases available for a proportionality comparison, and gave general guidance to consider similar cases in which the death penalty was imposed by state courts and reviewed by the Supreme Court of the United States. We were not given any more specific guidance concerning the scope of this proportionality review.

The appellant sought clarification of this decision regarding the "universe of cases" to be examined in conducting a proportionality review, but the Court denied the motion without prejudice. *United States v. Curtis,* 37 M.J. 43, (C.M.A.1992) (order). Judges Gierke and Wiss dissented asserting that such a determination would then be left to this Court, and our determination would be reviewed by the Court of Military Appeals anyway in due course. Given this background and the fact that this was the first death penalty case to be returned for a proportionality review since the new death penalty procedures were promulgated for the armed services, it is not surprising that the appellant and the Government are at odds as to the "universe of cases" we should examine.

The appellant takes an expansive view and argues that we should consider all cases where the defendant has been convicted of a death-eligible offense. He asserts that this includes all cases where it was determined not to seek the death penalty, where a plea bargain ensued after the death penalty was sought, where a death penalty was sought but a life sentence was imposed, and where a death penalty was sought and death was imposed. In addition, the appellant asserts that we must compare cases by an objective standard in order to adhere to *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), thereby avoiding the arbitrary and capricious imposition of the death penalty. The appellant also suggests a mechanism to compare cases and urges us to adopt a proportionality review similar to that of the State of New Jersey.[11]

In contrast, the Government's view as to the universe of cases to consider is much more limited. In fact, the Government implies that since the date of remand, there are now a sufficient number of military death penalty cases pending such that we could limit our review to these cases alone. We do not agree with the view of either the appellant or the Government.

A review of the precedent of the U.S. Supreme Court is useful to determine the Constitutional requirements regarding proportionality so that we can establish the proper foundation for a proportionality review in this case as well as for future death penalty cases coming before this Court. Neither the Eighth Amendment to the Constitution nor any Supreme Court case requires a comparative proportionality review in every capital case. *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Where such a review is undertaken, the review is not considered ineffective because cases are not compared in which life imprisonment is imposed in a capital case or where the jury convicted of a lesser offense, *Proffitt v. Florida,* 428 U.S. 242,

11. The state of New Jersey appointed David C. Baldus, a law school professor, to develop a mechanism for conducting a proportionality review. The appellant requested that the Judge Advocate General of the Navy provide funds to hire Mr. Baldus as an expert consultant in the field of proportionality. Counsel for the appellant averred in this request that they were incapable of briefing this issue, dealing with the merging of legal theory and statistical analysis, without the assistance of such an expert. They persisted in this position at the time of filing of their initial brief and declined in their brief to even cite one case with which to compare the appellant's sentence. The Judge Advocate General denied the request for expert assistance, and we likewise denied the appellant any relief in this regard.

96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (plurality opinion), or because cases are not considered in which capital convictions are not appealed. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (plurality opinion). "[A]bsent a showing that the ... capital punishment system operates in an arbitrary and capricious manner, [the appellant] cannot prove a constitutional violation by demonstrating that other defendants who may be similarly situated did *not* receive the death penalty." *McCleskey v. Kemp*, 481 U.S. 279, 306–07, 107 S.Ct. 1756, 1774–75, 95 L.Ed.2d 262 (1987). Nor is the proportionality review arbitrary or ineffective because the reviewing court applies a subjective standard as opposed to applying a rigid objective standard. *Proffitt*, 428 U.S. at 258, 96 S.Ct. at 2969. The U.S. Supreme Court has found that discretionary actions in processing a murder case (a prosecutorial decision not to seek the death penalty or to plea bargain, a jury decision to convict a defendant of a lesser offense, or a decision to commute a death sentence) which afford a defendant mercy do not violate the Constitution. *Gregg*, 428 U.S. at 199, 96 S.Ct. at 2937. *Accord Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (plurality opinion). "Where the discretion that is fundamental to our criminal process is involved, we decline to assume that what is unexplained is invidious." *McCleskey*, 481 U.S. at 313, 107 S.Ct. at 1778. Thus, failing to compare cases in which these types of discretionary actions have occurred does not render a proportionality review unconstitutional. Statistical studies which only tend to show disparities in sentencing do not appear to be particularly helpful in a proportionality review. *See McCleskey.*[12]

While some jurisdictions establish the scope of a proportionality review by statute, *see Gregg*, and others by case law, *see Proffitt*, we have the benefit of neither. Congress has not mandated a proportionality review in the UCMJ much less legislated the scope of such a review. Nor has the President provided for such a review in the Manual for Courts–Martial. As previously noted, the Court of Military Appeals has ordered a review, *see Curtis*, 33 M.J. at 109 (held that Article 66(c), UCMJ, 10 U.S.C. § 866(c), which requires a sentence appropriateness review by Courts of Military Review encompasses a limited proportionality review of death cases), but has declined to specifically define its scope, and no other cases involving such a review have yet been ruled on by the Court of Military Appeals.[13] The Army Court of Military Review has conducted proportionality reviews in three cases, *United States v. Murphy*, 36 M.J. 1137, (A.C.M.R.1993), *United States v. Gray*, 37 M.J. 730, (A.C.M.R. 1992), and *United States v. Loving*, 34 M.J. 956 (A.C.M.R.1992). In those case, the scope of the Army Court's review consisted of an examination of cases reviewed by the U.S. Supreme Court since the reinstatement of the death penalty following *Furman v. Georgia*. In addition, the review in *Murphy* included examining the *Gray* and *Loving* cases.

We agree with the Army Court that it is appropriate to examine military cases where the death penalty was imposed in addition to U.S. Supreme Court cases since conduct in the military environment cannot always be easily compared to conduct in civilian society. We believe it is appropriate to examine one other category of cases as well—those cases within our service that were referred capital in which death remained a possible punishment at the time the members adjudicated a sentence. These cases are relevant to a meaningful comparison, are relatively few in number, and we have access to the facts and circumstances of each incident, as well as information concerning each accused. Consequently, after carefully considering the appropriate "universe of cases" in this and future proportionality reviews, we have determined that we will consider the

---

12. The statistical study in the *McCleskey* case was done by Professor Baldus, the same individual which the appellant requested as an expert consultant.

13. An overt proportionality review was never employed by a Court of Military Review in any death penalty case decided prior to *Furman.*

following cases: (1) Post-*Furman* cases reviewed by the U.S. Supreme Court in which state courts have imposed the death penalty; (2) all military cases tried after August 1, 1984,[14] and reviewed by the appropriate court of military review, in which the trial court imposed the death penalty; and (3) all capital cases in the naval service tried after August 1, 1984, and reviewed by this Court in which the accused was death-eligible at the time of sentencing, irrespective of whether the accused was sentenced to death or life.

We specifically reject the position that we should compare all cases in which a defendant committed an offense which could potentially be referred capital, cases where discretion was exercised at some point in the proceeding which removed death as a possible sentence, cases in which a finding of some offense less than premeditated or felony murder was reached, and *all* cases where a life sentence instead of death was adjudged.[15] We further reject the notion that we should order and consider some form of statistical study or model to aid us in this review. As we have discussed, none of the foregoing is constitutionally required. We conclude that any attempt to compare this case with these categories of cases would be too speculative to be of any benefit. Nor do we believe that any form of a statistical study would be of any assistance.

We have carefully examined our defined "universe of cases" and have concluded that the sentence in this case is generally proportional to those imposed in similar situations.[16]

## V.

Finally, we again consider the appropriateness of the appellant's sentence to death. We analyzed this issue in our initial opinion, *Curtis*, 28 M.J. at 1092–1095, and we adopt that same analysis again. As this Court stated: "[W]e view the crimes committed by Curtis to be heinous and outrageous. The slaying of Lieutenant Lotz, Curtis' officer-in-charge, and Mrs. Lotz in their quarters aboard a military base and the manner in which these killings were accomplished convinces us that the death sentence is clearly proper." *Id.* at 1094–1095. We remain convinced that the death sentence is proper and appropriate for these offenses.[17] We have also carefully considered all of the remaining assignments of error raised in this appeal and conclude that they are without merit.

## VI.

We conclude that the findings and sentence are correct in law and fact and that

**14.** August 1, 1984, is the date the President promulgated the Manual for Courts–Martial, United States, 1984, which contained R.C.M. 1004, the new procedural changes for capital cases in the armed services.

**15.** We choose to make an exception with respect to this last category for cases in the naval service where a life sentence was imposed instead of death. We do so only because the facts concerning these cases are readily available to us in order to form a basis for comparison. This is not true of cases from other jurisdictions, even from our sister services.

**16.** We have examined over a hundred U.S. Supreme Court cases decided after *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). We have examined *United States v. Murphy*, 36 M.J. 1137. (A.C.M.R.1993), *United States v. Gray*, 37 M.J. 730, (A.C.M.R.1992), and *United States v. Loving*, 34 M.J. 956 (A.C.M.R. 1992) (military cases outside the naval service). We have also examined *United States v. Gonza-*

*lez*, No. 884472 (N.M.C.M.R. Oct. 26, 1992), *United States v. Gibbs*, No. 910249 (N.M.C.M.R. Sept. 24, 1992), *United States v. Colon*, No. 884988 (N.M.C.M.R. Oct. 31, 1990), *United States v. Ameen*, No. 872655 (N.M.C.M.R. May 22, 1989), *United States v. Turner*, No. 854044R (N.M.C.M.R. Oct. 31, 1988), *United States v. Reliford*, No. 864905 (N.M.C.M.R. Sep. 30, 1987), *United States v. Clark*, No. 864407 (N.M.C.M.R. Sep. 4, 1987), *United States v. Perez*, No. 862275 (N.M.C.M.R. May 5, 1987), *United States v. Garraway*, No. 862199 (N.M.C.M.R. Mar. 4, 1987), and *United States v. Blackshire*, No. 852309 (N.M.C.M.R. Feb. 20, 1986) (cases within the naval service where the accused was death-eligible at the time of sentencing).

**17.** In arriving at this conclusion, we have considered all of the circumstances surrounding the offenses, all of the evidence in extenuation and mitigation, and all of the matters recently brought to light by the background investigation and psychiatric evaluation arranged by appellate defense counsel.

no error materially prejudicial to the substantial rights of the appellant was committed. We are convinced of the appellant's guilt of all of the charges and specifications beyond a reasonable doubt. Article 66(c), UCMJ. Accordingly, the findings and sentence, as approved on review below, are affirmed.

Chief Judge LARSON, Senior Judges FREYER,* WELCH, ORR and JONES, and Judges REED, and LAWRENCE concur.

MOLLISON, Judge (dissenting):

I agree with the majority that the trial court erred in its instructions by doubling the aggravating factors,[1] however, I disagree that the error may be *or* should be remedied by harmless-error analysis. I would remedy this error by commuting appellant's death sentence to imprisonment for life.

Recently, in *Sullivan v. Louisiana,* — U.S. —, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), the United States Supreme Court held that certain trial errors of constitutional proportions defy the application of harmless-error analysis by appellate courts. Specifically, the Court held that harmless-error analysis could not be applied to an erroneous instruction on the definition of "reasonable doubt." In doing so, the Court explained that harmless-error analysis of a trial error of constitutional proportions is unavailable when the error vitiates the jury's verdict or creates a structural defect in the constitution of the trial mechanism. In order for a defect to constitute a "structural error" for which harmless-error analysis is unavailable, (1) the error must be a

deprivation of a basic protection, that is, a constitutional guarantee whose precise effects are unmeasurable, but without which a criminal trial cannot reliably serve its function, and (2) the deprivation must have consequences that are necessarily unquantifiable and indeterminate. — U.S. —, 113 S.Ct. at 2081.

It is axiomatic that the mechanism for assessing the death penalty embodies basic constitutional protections and that an error in that mechanism is of constitutional proportions. *Cf., United States v. Matthews,* 16 M.J. 354 (1983). An instruction which misstates the mechanism by doubling the factors upon which a jury may base its decision deprives the accused of that basic protection with unquantifiable and indeterminate consequences. Hence, the harmless-error analysis upon which the majority embarks is now constitutionally unavailable.

Assuming *arguendo, Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), which authorized reweighing or harmless-error analysis by state appellate courts in capital sentencing cases,[2] survived *Sullivan, Clemons* was not "intended to convey the impression that ... appellate courts are required to or necessarily should engage in reweighing or harmless-error analysis when errors have occurred in a capital sentencing proceeding." 494 U.S. at 754, 110 S.Ct. at 1451. Hence, even if we may employ a harmless-error analysis, we must answer the question whether we *should.*

There is no legislative guidance on the capital sentencing mechanism for trials by court-martial.[3] Nonetheless, Congress has

---

* Senior Judge Freyer took final action on this case prior to his transfer to a new duty station.

1. It has not been argued that the first aggravating factor trebled the count under the circumstances of this case.

2. *See also Sochor v. Florida,* — U.S. —, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992).

3. The capital sentencing scheme adopted by the President for courts-martial is in the nature of a "weighing" scheme. *See generally Stringer v. Black,* — U.S. —, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992). Before the death penalty may be

awarded by the members, they must unanimously find beyond a reasonable doubt that one or more specific aggravating factors exist, and having so found, they must then unanimously find that any extenuating or mitigating circumstances are substantially outweighed by any aggravating circumstances, including the specific aggravating factors. Rule for Courts-Martial (R.C.M.) 1004, Manual for Courts-Martial, United States, 1984. Weighing schemes, as distinguished from non-weighing schemes, require that aggravating factors be defined with some degree of precision. *Stringer v. Black,* — U.S. at —, 112 S.Ct. at 1136.

not left us entirely adrift. Article 55, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 855, prohibits the imposition of cruel *or* unusual punishments, and "in enacting Article 55, Congress 'intended to grant protection covering even wider limits' than 'that afforded by the Eighth Amendment.' " *Matthews*, 16 M.J. at 368 (quoting *United States v. Wappler*, 2 U.S.C.M.A. 393, 396, 9 C.M.R. 23, 26, 1953 WL 2598 (1953)). Given the context of this capital sentencing process, the precision required as to the "weighing" scheme employed,[4] and the statutory guidance afforded us by Congress, I am of the view we are obliged to resolve errors in the courts-martial capital sentencing process *in favorem vitae* and without resort to harmless-error analysis. While I do not suggest all trial errors in capital cases are beyond harmless-error analysis,[5] I do suggest that those constitutional errors infecting the most critical part of the procedure, instructions on the capital sentencing mechanism, like the instruction defining "reasonable doubt," are.

The appellant was entitled to have his sentence decided by a unanimous panel of officer and enlisted personnel and to have the panel correctly instructed on those factors upon which they would determine whether he should live or die. Appellant's panel was misinformed. This Court, whose composition is entirely different, now engages in "pure speculation" when it presumes to say what the members would have done upon correct instructions. *See Sullivan,* —— U.S. at ——, 113 S.Ct. at 2081. I prefer not to engage in such speculation. More importantly, in my view, the Constitution and the Code preclude it.

### APPENDIX

#### Assignments of Error

I. APPELLANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BY TRIAL DEFENSE COUNSEL.

II. APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL FROM HIS APPELLATE DEFENSE COUNSEL.

III. THE LACK OF AN INDEPENDENT DEFENSE COMMAND IN THE NAVAL JUSTICE SYSTEM CONSTITUTED IMPROPER COMMAND INFLUENCE IN THAT IT DEPRIVED APPELLANT OF DUE PROCESS OF LAW AT TRIAL AND ON APPEAL.

IV. THE DETAILING OF LCDR HOLT AS APPELLATE COUNSEL IN RESPONSE TO APPELLATE DEFENSE COUNSEL'S REQUEST THAT COUNSEL QUALIFIED UNDER THE ABA GUIDELINES BE DETAILED, ASSIGNED, OR HIRED TO ASSIST THE MILITARY APPELLATE DEFENSE COUNSEL ALREADY ASSIGNED TO REPRESENT [APPELLANT] WAS IMPROPER COMMAND INFLUENCE.

V. SPECIFICATION 2 OF CHARGE II FAILS TO STATE AN OFFENSE BECAUSE IT DOES NOT ALLEGE A LEGALLY–CORRECT PERSON AND BECAUSE IT FAILS TO STATE THE VALUE OF PROPERTY IN THAT IT DOES NOT ALLEGE THE VALUE OF ONE GREEN 1983 RENAULT ALLIANCE.

VI. SPECIFICATION 3 OF CHARGE II FAILS TO STATE AN OFFENSE BECAUSE IT DOES NOT ALLEGE A LEGALLY–CORRECT PERSON AND BECAUSE IT FAILS TO STATE THE VALUE OF PROPERTY IN THAT IT DOES NOT ALLEGE THE VALUE OF ONE RED 1985 FORD TEMPO.

VII. CHARGES II–IV AND ADDITIONAL CHARGES I–V ARE MULTIPLICIOUS FOR FINDINGS INASMUCH AS THEY WERE PART OF ONE CONTINUOUS COURSE OF CONDUCT PROHIBITED BY CHARGE I (ONE STATUTORY PROVISION OF PREMEDITATED MURDER).

VIII. THE CONVENING AUTHORITY ABUSED HIS DISCRETION IN REFER-

---

**4.** Note 3, *supra.*

**5.** See *Satterwhite v. Texas*, 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988).

RING BOTH SERIOUS AND MINOR OFFENSES TO THE SAME COURT.

IX. APPELLANT DID NOT KNOWINGLY AND INTELLIGENTLY WAIVE HIS ARTICLE 38(B)(2) STATUTORY RIGHT TO CIVILIAN COUNSEL AND HIS ARTICLE 38(B)(3)(B) STATUTORY RIGHT TO MILITARY COUNSEL OF HIS OWN SELECTION WHERE MILITARY COUNSEL FAILED TO ADVISE APPELLANT OF HIS PROFESSIONAL DEFICIENCIES WHICH INCLUDED NO CAPITAL EXPERIENCE, NO CAPITAL TRAINING, AND EXPERIENCE IN SOPHISTICATED LITIGATION, AND FAILED TO ADVISE CLIENT THAT HE HAD DETAILED HIMSELF TO THE CASE.

X. APPELLANT DID NOT KNOWINGLY AND INTELLIGENTLY WAIVE HIS ARTICLE 38(B)(2) STATUTORY RIGHT TO CIVILIAN COUNSEL AND HIS ARTICLE 38(B)(3)(B) STATUTORY RIGHT TO MILITARY COUNSEL OF HIS OWN SELECTION WHERE MILITARY JUDGE MISLED APPELLANT BY STATING THAT HIS COUNSEL WERE "QUALIFIED LAWYERS" AND THAT HIS LEAD COUNSEL WAS A "LAWYER OF CONSIDERABLE EXPERIENCE," WHEN NEITHER COUNSEL HAD TRIED A CAPITAL CASE, TRIED A MURDER CASE, OR HAD RECEIVED ANY DEATH PENALTY CONTINUING LEGAL EDUCATION.

XI. THE MILITARY JUDGE ERRED IN FAILING TO INQUIRE AS TO THE IDENTITY OF THE AUTHORITY WHO DETAILED MILITARY DEFENSE COUNSEL AND IN FAILING TO ENSURE THAT COUNSEL WERE QUALIFIED IN TRAINING, EXPERIENCE, AND EDUCATION TO DEFEND A CAPITAL CASE.

XII. ARTICLE 25(C)(1)'S EXCLUSION FROM COURT–MARTIAL SERVICE OF ENLISTED MEMBERS OF THE SAME UNIT OF THE ACCUSED IS A RACIALLY DISCRIMINATORY RULE TO PRECLUDE BLACK ENLISTED MEN FROM HAVING BLACK PEERS SIT ON THE COURT–MARTIAL.

XIII. ARTICLE 18, U.C.M.J. AND R.C.M. 201(F)(1)(C), WHICH REQUIRE TRIAL BY MEMBERS IN A CAPITAL CASE, VIOLATES THE FIFTH AND EIGHTH AMENDMENT GUARANTEE OF DUE PROCESS AND A RELIABLE VERDICT.

XIV. APPELLANT WAS DENIED HIS FIFTH AMENDMENT RIGHT TO A GRAND JURY PRESENTMENT OR INDICTMENT.

XV. ARTICLE 25(C)(1)'S EXCLUSION FROM COURT–MARTIAL SERVICE OF ENLISTED MEMBERS OF THE SAME UNIT AS THE ACCUSED INJECTS AN IMPROPER CRITERION (ENLISTED STATUS) IN SELECTING THE MEMBERS POOL.

XVI. THE UNITED STATES CONSTITUTION'S APPOINTMENTS CLAUSE PROHIBITS THE JUDGE ADVOCATE GENERAL FROM APPOINTING GENERAL COURT–MARTIAL JUDGES.

XVII. THE ACCUSED WAS DENIED A FAIR AND IMPARTIAL HEARING BECAUSE OF ADVERSE PRETRIAL PUBLICITY AND RACIAL DISCRIMINATION AGAINST THE APPELLANT.

XVIII. COURT–MARTIAL PROCEDURES DENIED APPELLANT HIS ARTICLE III RIGHT TO A JURY TRIAL.

XIX. THE CONVENING AUTHORITY DID NOT UNDERSTAND THE LAW AND HIS OPTIONS (INCLUDING DETAILING AN ALL–ENLISTED COURT AND RANDOM SELECTION OF MEMBERS FOR HIS FURTHER SCREENING) REGARDING DETAILING ENLISTED MEMBER PURSUANT TO ARTICLE 25.

XX. THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS DO NOT PERMIT, IN PEACETIME, A CONVENING AUTHORITY TO HAND–PICK MILITARY SUBORDINATES, WHOSE CAREERS HE CAN DIRECTLY AND IMMEDIATELY AFFECT AND CONTROL, AS MEMBERS TO DECIDE A CAPITAL CASE FOR OFFENSES THAT OCCUR ON A MILITARY BASE BUT WHERE THERE IS CONCUR-

RENT JURISDICTION WITH A STATE AUTHORITY.

XXI. COURT–MARTIAL PROCEDURES DENIED APPELLANT OF HIS SIXTH AMENDMENT RIGHT TO JURY TRIAL AND AN IMPARTIAL CROSS–SECTION OF THE COMMUNITY.

XXII. APPELLANT WAS DENIED HIS FIFTH AMENDMENT DUE PROCESS OF LAW BY COMMAND ACTION IN DETAILING 18 MALE PANEL MEMBERS, INTENTIONALLY DISCRIMINATING AGAINST WOMEN, AND EXCLUDING THEM FROM THE COURT.

XXIII. THE GOVERNMENT MAY NOT MAKE A *WITHERSPOON* CHALLENGE AFTER THE CONVENING AUTHORITY EXERCISES HIS ARTICLE 25 STATUTORY RESPONSIBILITY AND DETAILS A MEMBER.

XXIV. THE PRESIDENT EXCEEDED HIS ARTICLE 36 POWERS TO ESTABLISH PROCEDURES FOR COURTS–MARTIAL WHEN HE GRANTED THE TRIAL COUNSEL A PEREMPTORY CHALLENGE AND THEREBY THE POWER TO NULLIFY THE CONVENING AUTHORITY'S ARTICLE 25(D) STATUTORY AUTHORITY TO DETAIL MEMBERS OF THE COURT.

XXV. THE PEREMPTORY CHALLENGE PROCEDURE IN THE MILITARY JUSTICE SYSTEM CONSTITUTES AN UNCONSTITUTIONAL VIOLATION OF THE FIFTH AND EIGHT AMENDMENTS IN CAPITAL CASES WHERE THE PROSECUTOR IS FREE TO REMOVE A MEMBER WHOSE MORAL BIAS AGAINST THE DEATH PENALTY DOES NOT JUSTIFY A CHALLENGE FOR CAUSE.

XXVI. PROSECUTION EXHIBIT 1, A COLOR WEDDING PHOTOGRAPH OF THE VICTIMS, WAS INADMISSIBLE, IMPERMISSIBLY INFLAMED THE MEMBERS, AND PREJUDICED APPELLANT'S TRIAL.

XXVII. PROSECUTION EXHIBITS 3, 4, AND 13, PHOTOGRAPHS OF THE VICTIMS, WERE INADMISSIBLE, IMPERMISSIBLY INFLAMED THE MEMBERS, AND PREJUDICED APPELLANT'S TRIAL.

XXVIII. THE WARRANTLESS SEARCH AND SEIZURE OF APPELLANT'S CLOTHING BY THE ONSLOW COUNTY JAILOR WAS AN UNREASONABLE SEARCH AND SEIZURE IN VIOLATION OF THE FOURTH AMENDMENT.

XXIX. THE CONFESSIONS OF APPELLANT ARE INADMISSIBLE BECAUSE HE WAS NOT ADVISED THAT HE WAS SUSPECTED OF MURDER OR ANY PARTICULAR OFFENSE WHEN HE WAS INFORMED OF HIS *MIRANDA* RIGHTS.

XXX. APPELLANT'S CONFESSIONS WERE INVOLUNTARY AND INADMISSIBLE WHERE HE WAS NOT GIVEN HIS *MIRANDA* RIGHTS PRIOR TO INTERROGATION (ARTICLE 32 RECORD AT 65, AND 78–80, I.O. EXHIBIT XXIII).

XXXI. APPELLANT'S CONFESSIONS WERE INADMISSIBLE WHERE IMPROPER CLEANSING WARNINGS WERE GIVEN ALMOST NINETY MINUTES AFTER APPELLANT'S INTERROGATION BEGAN.

XXXII. NORTH CAROLINA OFFICERS WERE ACTING FOR THE MILITARY DURING THEIR INTERROGATION AND WERE THUS REQUIRED TO ADVISE APPELLANT OF HIS ARTICLE 31 RIGHTS, WHICH THEY FAILED TO DO.

XXXIII. THERE IS INSUFFICIENT EVIDENCE THAT JOAN LOTZ WAS ALIVE AT THE TIME OF THE ALLEGED WRONGFUL TOUCHING TO ESTABLISH GUILT OF THE SEXUAL ASSAULT UNDER ADDITIONAL CHARGE II.

XXXIV. THE GOVERNMENT FAILED TO PROVE, BEYOND A REASONABLE DOUBT, THAT APPELLANT KILLED JOAN LOTZ WITH PREMEDITATION.

XXXV. THERE IS INSUFFICIENT EVIDENCE TO ESTABLISH LARCENY IN ADDITIONAL CHARGE I.

XXXVI. THE OPINION OF THE COURT OF MILITARY REVIEW IS INADE-

QUATE AS A MATTER OF LAW WHERE THE OPINION FAILS TO ADDRESS CONSIDERATION OF THE DEFENSE OF DIMINISHED CAPACITY ESTABLISHED IN *ELLIS V. JACOB*, 26 M.J. 90 (C.M.A.1988).

XXXVII. THE DESIGNATION OF THE SENIOR MEMBER AS THE PRESIDING OFFICER FOR DELIBERATIONS DENIED THE APPELLANT DUE PROCESS OF LAW AND A FAIR AND IMPARTIAL MEMBERS' CONSIDERATION OF THE EVIDENCE, BY ESTABLISHING THE SENIOR MEMBER'S SUPERIORITY IN AND CONTROL OF THE DELIBERATION PROCESS.

XXXVIII. THE MILITARY JUDGE FAILED TO PROPERLY INSTRUCT THE MEMBERS REGARDING THE LAW OF A CAPITAL CASE AND THE CAPITAL SENTENCING MECHANISM OF R.C.M. 1004 AND 1006, WHEN THE JUDGE FAILED TO INFORM THE MEMBERS OF THESE MATTERS IN PRELIMINARY INSTRUCTIONS AND FIRST EXPLAINED THEM AFTER COUNSEL'S SENTENCING ARGUMENT.

XXXIX. THE MILITARY JUDGE ERRED IN FAILING TO *SUA SPONTE* INSTRUCT THE MEMBERS ON VOLUNTARY MANSLAUGHTER AND ERRONEOUSLY LIMITED THE MEMBERS' CONSIDERATION TO ONLY PREMEDITATED AND UNPREMEDITATED MURDER WITH REGARD TO THE KILLING OF JOAN LOTZ.

XL. A MANSLAUGHTER INSTRUCTION MUST INCORPORATE THE SUBJECTIVE BELIEF RATHER THAN THE OBJECTIVE BELIEF OF A REASONABLE PERSON.

XLI. THE MILITARY JUDGE'S INSTRUCTION ON BURGLARY WAS INCOMPLETE AND PREJUDICIAL TO APPELLANT WHERE THE INSTRUCTION FAILED TO INFORM MEMBERS THAT THE BURGLARY OFFENSE COULD BE SUPPORTED BY THE FELONY OF MANSLAUGHTER.

XLII. THE MILITARY JUDGE ERRED BY FAILING TO PROVIDE A *SUA SPONTE* INSTRUCTION THAT VOLUNTARY INTOXICATION IS A DEFENSE TO THE SPECIFIC INTENT ELEMENT OF UNPREMEDITATED MURDER.

XLIII. THE MILITARY JUDGE'S INSTRUCTION ON PREMEDITATED MURDER AS "MURDER COMMITTED AFTER FORMATION OF A SPECIFIC INTENT TO KILL SOMEONE AND CONSIDERATION OF THE ACTION INTENDED" DID NOT SUFFICIENTLY ADVISE THE MEMBERS OF THE *MALICE* ASPECT OF PREMEDITATION AND DID NOT PERMIT AN INFORMED MEMBER TO EVALUATE THE APPELLANT'S MENS REA AT THE TIME OF THE OFFENSES.

XLIV. THE MILITARY JUDGE'S INSTRUCTIONS RESTRICTED FREE CONSIDERATION OF THE EVIDENCE BY REQUIRING THE MEMBERS TO VOTE ON THE MOST SERIOUS OFFENSE FIRST.

XLV. THE MILITARY JUDGE'S [sic] ERRED IN FAILING TO GIVE AN INSTRUCTION ON SELF–DEFENSE REGARDING APPELLANT'S KILLING OF MRS. LOTZ.

XLVI. IN A CAPITAL CASE WHERE THE APPELLANT'S NOT GUILTY PLEA WAS MANDATORY BY STATUTE, THE MILITARY JUDGE HAD A *SUA SPONTE* OBLIGATION TO INQUIRE WHETHER THE APPELLANT UNDERSTOOD UNEQUIVOCALLY THE CONSEQUENCES OF HIS TESTIMONY WHERE HE TESTIFIED IN RESPONSE TO HIS OWN COUNSEL THAT HE "DECIDED TO KILL [LT LOTZ]."

XLVII. THE MILITARY JUDGE ERRED IN FAILING TO GIVE A REQUESTED INSTRUCTION REGARDING MITIGATING FACTORS IN GENERAL AND IN FAILING TO EVEN MENTION ALCOHOL INTOXICATION IN PARTICULAR AS A MITIGATING FACTOR, TO THE PREJUDICE OF THE APPELLANT.

XLVIII. THE MILITARY JUDGE'S FAILURE TO INSTRUCT THE MEM-

BERS REGARDING THE BURDEN OF PROOF ON MITIGATING FACTORS WAS INADEQUATE GUIDANCE TO THEM IN THEIR DELIBERATIONS TO ENSURE A RELIABLE SENTENCING VERDICT.

IL. TRIAL COUNSEL INACCURATELY PORTRAYED THE INDECENT ASSAULT CHARGE (ADDITIONAL CHARGE II) AS AN INDEPENDENT CRIME AND UNLAWFULLY INFLAMED THE PANEL.

L. TRIAL COUNSEL ENGAGED IN UNLAWFULLY INFLAMMATORY ARGUMENT BY DENIGRATING THE NATURE OF THE RACIAL ISSUES IN THIS CASE, ARGUING COMMAND POLICY, AND RELIGIOUS REFERENCES.

LI. ARTICLE 118(1)'S MANDATORY MINIMUM LIFE SENTENCE IS UNCONSTITUTIONAL AS CRUEL AND UNUSUAL PUNISHMENT.

LII. WHERE THE FELONY IS BURGLARY WITH INTENT TO MURDER, THE USE OF FELONY–MURDER AS AN AGGRAVATING FACTOR UNCONSTITUTIONALLY NARROWS THE CLASS OF MURDERS SUBJECT TO THE DEATH PENALTY.

LIII. WHERE THE BURGLARY WAS COMPLETE PRIOR TO THE COMMISSION OF THE HOMICIDES, THERE WAS NOT A MURDER WHILE THE ACCUSED WAS "ENGAGED IN THE COMMISSION OF A BURGLARY."

LIV. THE REQUIREMENTS OF R.C.M. 1004(C)(7)(B) WERE NOT SATISFIED INASMUCH AS THE ABSENCE OF A BREAKING NEGATED ANY BURGLARY.

LV. THE DEATH PENALTY SENTENCING STANDARD REQUIRING AGGRAVATING FACTORS TO "SUBSTANTIALLY OUTWEIGH" EXTENUATING AND MITIGATING CIRCUMSTANCES IS UNCONSTITUTIONAL; THE ONLY ACCEPTABLE STANDARD MUST BE "BEYOND A REASONABLE DOUBT."

LVI. THE MILITARY JUDGE COMMITTED PLAIN ERROR BY FAILING TO INSTRUCT THE MEMBERS ON SENTENCING AS TO THE TERM "SUBSTANTIALLY OUTWEIGHED" WITH REGARD TO THE RELATIONSHIP OF MITIGATING CIRCUMSTANCES TO AGGRAVATING FACTORS.

LVII. THE FINDINGS MUST STATE EXPLICITLY THAT ALL MEMBERS CONCUR THAT ANY EXTENUATING OR MITIGATING CIRCUMSTANCES ARE SUBSTANTIALLY OUTWEIGHED BY THE AGGRAVATING FACTORS FOUND BY THE MEMBERS.

LVIII. THE MILITARY JUDGE'S INSTRUCTION THAT "YOU MAY NOT ADJUDGE A SENTENCE OF DEATH UNLESS YOU FIND THAT ANY AND ALL EXTENUATING OR MITIGATING CIRCUMSTANCES ARE SUBSTANTIALLY OUTWEIGHED BY ANY AGGRAVATING FACTORS ..." DID NOT SUFFICIENTLY INFORM THE MEMBERS THAT THIS FINDING MUST BE UNANIMOUS.

LIX. THE MILITARY JUDGE ERRED IN FAILING TO EXPLICITLY INSTRUCT THAT EVEN IF THE MEMBERS UNANIMOUSLY FOUND ONE OR MORE AGGRAVATING FACTORS AND EVEN IF THE MEMBERS UNANIMOUSLY DETERMINE THAT THE EXTENUATING OR MITIGATING CIRCUMSTANCES ARE SUBSTANTIALLY OUTWEIGHED BY THE AGGRAVATING FACTORS, EACH MEMBER STILL HAD THE ABSOLUTE DISCRETION TO DECLINE TO IMPOSE THE DEATH SENTENCE.

LX. THERE WAS AN UNLAWFUL DOUBLE COUNTING OF A SINGLE AGGRAVATING CIRCUMSTANCE (A DOUBLE MURDER), WHERE THE MURDER OF JAMES LOTZ WAS ALLEGED AS AN AGGRAVATING FACTOR OF THE MURDER OF JOAN LOTZ AND THE MURDER OF JOAN LOTZ WAS ALLEGED AS AN AGGRAVATING FACTOR OF THE MURDER OF JAMES LOTZ.

LXI. APPELLANT WAS PREJUDICED BY THE "DOUBLING UP" OF AGGRAVATING FACTORS.

LXII. THE TRIAL COUNSEL'S FAILURE TO GIVE THE DEFENSE TIMELY NOTICE OF THEIR INTENT TO ALLEGE EACH MURDER AS AN AGGRAVATING FACTOR FOR THE OTHER MURDER MISLED AND PREJUDICED THE DEFENSE.

LXIII. THE GOVERNMENT FAILED TO PROVIDE THE DEFENSE NOTICE OF AN AGGRAVATING FACTOR AS REQUIRED BY R.C.M. 1004(B)(1) WHEN THE TRIAL COUNSEL *IMPLICITLY* PRESENTED TO THE MEMBERS THE R.C.M. 1004(C)(7)(G) AGGRAVATING FACTOR THAT LT LOTZ WAS A COMMISSIONED OFFICER MURDERED IN THE EXECUTION OF HIS OFFICE AND WHEN THE TRIAL COUNSEL *EXPLICITLY* ARGUED THAT EVERY MARINE OFFICER IS TAUGHT THAT HE SHOULD TAKE CARE OF HIS TROOPS AND THAT LT LOTZ DIED IN THE EXECUTION OF THAT DUTY.

LXIV. THE GOVERNMENT FAILED TO SERVE DEFENSE COUNSEL ON 9 JULY 1987 WITH NOTICE OF THE AGGRAVATING FACTORS AND LATER CHANGED THOSE AGGRAVATING FACTORS DURING TRIAL, PROVIDING DEFENSE WITH INSUFFICIENT TIME TO PREPARE TO CHALLENGE THE AGGRAVATING FACTORS.

LXV. DUE PROCESS IN CAPITAL CASES REQUIRES TRIAL DEFENSE COUNSEL TO FILE A SEALED STATEMENT ATTACHED TO THE RECORD WHEN COUNSEL INTENTIONALLY DECIDES NOT TO OFFER SPECIFIC SIGNIFICANT MATTERS IN MITIGATION DETAILING THE REASONS FOR THE DECISION AND THE CLIENT'S EXPRESS CONSENT TO THE OMISSION OF THESE MATERIALS.

LXVI. R.C.M. 1004 IS UNCONSTITUTIONAL UNDER THE FIFTH AND EIGHTH AMENDMENTS AND VIOLATES ARTICLE 55, U.C.M.J., BY NOT REQUIRING THAT SENTENCING PROCEDURES BE MORE DETAILED AND SPECIFIC TO ALLOW A RATIONAL UNDERSTANDING BY THE MILITARY JUDGE AND CONVENING AUTHORITY AS TO THE STANDARDS USED BY THE SENTENCING AUTHORITY.

LXVII. R.C.M. 1004 DOES NOT INCORPORATE THE PRINCIPLES OF LAW APPLIED IN FEDERAL CRIMINAL CASES REFLECTING THE POLICY EXPRESSED BY CONGRESS IN VARIOUS STATUTES AND GENERALLY CONFORMING WITH THE MODEL PENAL CODE AND POLICIES EXPRESSED IN THE STATUTES OF MANY DEATH PENALTY STATES TO PROTECT THE DEFENDANT AND TO ENSURE A RELIABLE VERDICT AND APPROPRIATE SENTENCE.

LXVIII. THE CONVENING AUTHORITY'S ACTION WAS IMPROPER INASMUCH AS THE STAFF JUDGE ADVOCATE DID NOT PROPERLY COMMENT ON THE ACCUSED'S SANITY AND "SUICIDAL" STATE RAISED BY MRS. CURTIS' LETTER AND HER OFFER TO SUBMIT PSYCHIATRIC PAPERS AND ON THE DEFENSE COUNSEL'S CLEMENCY PETITION THAT ADDRESSED RACIAL HARASSMENT, APPELLANT'S INTOXICATION, AND EXEMPLARY LAW–ABIDING LIFE.

LXIX. ARTICLE 142(B)(2)'S LIMITATION OF COURT OF MILITARY APPEALS JUDGES TO TERMS OF OFFICE OF FIFTEEN YEARS VIOLATES ARTICLE III, SECTION 1, U.S. CONSTITUTION, WHICH GUARANTEES LIFE TERM OF OFFICE TO JUDGES OF INFERIOR COURTS AS THE CONGRESS MAY ESTABLISH.

LXX. THE FAILURE TO GUARANTEE THE MILITARY JUDGES AND JUDGES OF THE COURT OF MILITARY REVIEW A FIXED TERM OF OFFICE DENIED APPELLANT DUE PROCESS.

LXXI. THE COURT OF MILITARY REVIEW ERRED IN FAILING TO INQUIRE AS TO THE IDENTITY AND PRACTICE OF THE AUTHORITY WHO DETAILED

APPELLATE DEFENSE COUNSEL AND IN FAILING TO ENSURE THAT COUNSEL WERE QUALIFIED IN TRAINING, EXPERIENCE, AND EDUCATION TO DEFEND A CAPITAL CASE.

LXXII. APPELLANT WAS DENIED DUE PROCESS BY THE PURPOSEFUL OMISSION OF BLACK OFFICERS FROM SERVING AS JUDGES ON THE COURT OF MILITARY REVIEW DURING THE PERIOD OF APPELLANT'S INITIAL REVIEW.

LXXIII. THE FACT–FINDING COURT OF MILITARY REVIEW MUST *UNANIMOUSLY* AGREE ON BOTH FINDINGS OF GUILT AND THE SENTENCE IN A CAPITAL CASE.

LXXIV. THE UNITED STATES CONSTITUTION'S APPOINTMENTS CLAUSE PROHIBITS THE JUDGE ADVOCATE GENERAL FROM APPOINTING THIS COURT'S JUDGES.

LXXV. APPELLANT IS ENTITLED TO REPRESENTATION BY COUNSEL QUALIFIED UNDER THE AMERICAN BAR ASSOCIATION GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES (1989) ON APPEAL.

LXXVI. THE DEATH SENTENCE AWARDED IN THIS CASE IS DISPROPORTIONATE TO THE SENTENCES AWARDED IN OTHER DOUBLE MURDER CASES, AND DISPROPORTIONATE TO OTHER DEATH PENALTY CASES.

LXXVII. THE DEATH SENTENCE IS NOT AN APPROPRIATE SENTENCE IN THIS CASE.